**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------

UNITED STATES OF AMERICA, ex rel.
JOSEPH AMICO

                        Plaintiff/Relator,

   against

DEUTSCHE BANK AG; DB STRUCTURED
PRODUCTS, INC.; DEUTSCHE BANK
SECURITIES INC.; DB HOME LENDING LLC;
DB HOME LENDING HOLDINGS LLC;
MORTGAGEIT, INC.; DEUTSCHE ALT-A
SECURITIES, INC.; ALTAMONT HOLDINGS
CORP.; MORTGAGEIT SECURITIES CORP.; ACE
SECURITIES CORP.; DEUTSCHE BANK
NATIONAL TRUST COMPANY;

                   Defendants.

------------------------------------------------------------------

FILED UNDER SEAL

# 15 CV 9551

_____ CIV _____

**COMPLAINT**

JURY TRIAL DEMANDED

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------

UNITED STATES OF AMERICA, ex rel.
JOSEPH AMICO

                                    Plaintiff/Relator,

     against

DEUTSCHE BANK AG; DB STRUCTURED
PRODUCTS, INC.; DEUTSCHE BANK
SECURITIES INC.; DB HOME LENDING LLC;
DB HOME LENDING HOLDINGS LLC;
MORTGAGEIT, INC.; DEUTSCHE ALT-A
SECURITIES, INC.; ALTAMONT HOLDINGS
CORP.; MORTGAGEIT SECURITIES CORP.; ACE
SECURITIES CORP.; DEUTSCHE BANK
NATIONAL TRUST COMPANY;

                             Defendants.

------------------------------------------------------------------

FILED UNDER SEAL

# 15 CV 9551
_____ CIV _____

**COMPLAINT**

JURY TRIAL DEMANDED

**TABLE OF CONTENTS**

Page

NATURE OF ACTION ................................................................................................. 1

    A. RELATOR'S INFORMATION.................................................................. 8

PARTIES .................................................................................................................. 15

    A.    THE PLAINTIFF................................................................................ 15

    B.  THE RELATOR ................................................................................. 15

    C.  THE DEFENDANTS.......................................................................... 16

    D.  THE NON-PARTY ORIGINATORS.......................................................... 18

    E.  THE GOVERNMENT PURCHASERS .................................................... 19

JURISDICTION AND VENUE .................................................................................. 19

CONDITIONS PRECEDENT .................................................................................... 20

FACTS COMMON TO ALL COUNTS....................................................................... 21

    A.    MBS BACKGROUND ........................................................................ 22

    B.  THE DB RMBS PROCESS................................................................. 24

    C.  THE DB CDO PROCESS ................................................................... 28

    D.  RELATOR'S REVIEW OF THE BORROWERS AND COLLATERAL PROPERTIES REVEALS FRAUD ........................................................ 29

    E.  BORROWERS AND COLLATERAL PROPERTIES ............................... 32

    F.  DEFENDANTS FAILED TO APPROPRIATELY TRANSFER LOANS TO THE MBS TRUSTS ................................................................... 51

DEFENDANTS' USE OF FALSE RECORDS AND/OR STATEMENTS ................................ 53

    A.    DEFENDANTS USE OF REGISTRATION STATEMENTS AND OFFERING DOCUMENTS TO FURTHER THEIR SCHEME ................................... 53

    B.  DEFENDANTS USED NON-DELIVERY OF LOAN DOCUMENTS TO CONCEAL UNRELIABLE BORROWERS AND OVERVALUED PROPERTIES ................................................................................ 61

D. DEFENDANTS FAILED TO COMPLY WITH UNDERWRITING GUIDELINES DESPITE REPRESENTING THEY WOULD IN THE OFFERING DOCUMENTS ................................................................................... 64

E. DEFENDANTS OMITTED AND MISREPRESENTED MATERIAL INFORMATION IN THE OFFERING DOCUMENTS FOR THE CDOS ... 74

    1.    DB PURCHASED CREDIT PROTECTION FROM AIG AND SOLD CDOS TO MAIDEN LANE III ................................................... 76

F. DEFENDANTS CONTROLLED AND DIRECTED EVERY STEP OF THE SECURITIZATION PROCESS ...................................................... 78

G.    SALES OF RMBS TO AIG UNDER AIG'S SECURITIES LENDING PROGRAM AND FALSE STATEMENTS MADE IN CONNECTION THEREWITH .......................................................................... 80

H.    DIRECT LOAN SALES TO FHLMC AND FNMA AND FALSE STATEMENTS MADE IN CONNECTION THEREWITH ................. 81

I.    DIRECT LOAN SALES TO INDYMAC & WELLS FARGO AND FALSE STATEMENTS MADE IN CONNECTION THEREWITH ................. 84

THE U.S. GOVERNMENT FUNDED THE PURCHASE OF MBS AND CDOS AND SUFFERED SUBSTANTIAL LOSSES .......................................................... 85

A.    PURCHASES BY THE U.S. GOVERNMENT .................................... 85

B. DAMAGES TO THE U.S. GOVERNMENT IMPAIRED VALUE OF MBS ......... 86

    1.    IMPAIRED VALUE OF MBS ................................................. 86

    2.    IMPAIRED VALUE OF CDOS ............................................... 89

    3.    DAMAGE TO FANNIE MAE AND FREDDIE MAC .......................... 89

    4.    DAMAGES TO THE FAILED CREDIT UNIONS, THE FAILED BANKS, THE FAILED PENSION PLANS ................................. 90

    5.    DAMAGES FROM AIG BAILOUT ......................................... 91

CLAIMS FOR RELIEF ................................................................................. 92

A.    For Damages And Penalties Under The False Claims Act (31 U.S.C. § 3729(a)(1) (2006), and, as amended, 31 U.S.C. § 3729(a)(1)(A)) ......................................................................... 92

B.    FOR DAMAGES AND PENALTIES UNDER THE FALSE CLAIMS ACT U.S.C. § 3729(a)(2)(2006), and, as amended, 31 U.S.C. § 3729(a)(1)(B) ............................................................................................. 95

C.    FOR DAMAGES AND PENALTIES UNDER THE FALSE CLAIMS ACT (31 U.S.C. § 3729(a)(7)(2006), and, as amended, 31 U.S.C. § 3729(a)(1)(G))............................................................................................ 97

PRAYER FOR RELIEF .......................................................................................................... 98

DEMAND FOR TRIAL BY JURY ......................................................................................... 99

ANNEX A................................................................................................................................ 100

ANNEX B................................................................................................................................ 106

ANNEX C................................................................................................................................ 107

ANNEX D................................................................................................................................ 111

The United States of America, by and through Joseph C. Amico as Relator, brings this action against Defendants DEUTSCHE BANK AG; DB STRUCTURED PRODUCTS, INC. ("DB Structured Products"); DEUTSCHE BANK SECURITIES INC. ("DB Securities"); DB HOME LENDING LLC ("DBHL"); DB HOME LENDING HOLDINGS LLC ("DBHL Holdings"); MORTGAGEIT, INC. ("MortgageIT"); DEUTSCHE ALT-A SECURITIES, INC. ("DBALT"); ALTAMONT HOLDINGS CORP. ("Altamont Holdings"); MORTGAGEIT SECURITIES CORP. ("MITSC"); ACE SECURITIES CORP. ("ACE"); and DEUTSCHE BANK NATIONAL TRUST COMPANY (collectively or individually, "DB" or "Defendants") alleging as follows:

## NATURE OF ACTION

1.     This is an action under the False Claims Act ("FCA") by the United States of America, as related by Joseph C. Amico, to recover treble damages and civil penalties under the False Claims Act, as amended, 31 U.S.C. §§ 3729 et seq.[1] arising from Defendants' creation and sale of certain residential mortgage-backed securities ("RMBS," or generally, "MBS") and collateralized debt obligations ("CDOs") and the purchase of those securities using funds provided, insured, guaranteed or otherwise made available by the United States Government ("US Government"). The MBS covered by this Complaint are set forth on Annex A (Annex A is deemed to include both (i) all other MBS for which Defendants served as underwriter/placement agent, and (ii) third-party MBS for which MortgageIT or DBHL acted as originator and which included a

---

[1] This action is brought pursuant to both the FCA as it stood prior to the enactment of the Fraud Enforcement and Recovery Act of 2009 (the "FERA") and the FCA as amended by the FERA. Defendants' false and fraudulent statements and/or omission were made for the first time prior to 2009, have never been retracted or corrected and endure in form and effect to the present. This Complaint includes claims relating to the U.S. Government's financing, insuring, and guaranteeing of MBS and CDOs both before and after 2009.

description of MorgageIT or DBHL and its underwriting standards in the related prospectus supplement for such third-party MBS, but which are not listed on Annex A). The CDOs covered by this Complaint are set forth on Annex B (Annex B is deemed to include all other CDOs for which Defendants served as underwriter/placement agent and CDOs for which Defendants purchased credit protection from AIG and received proceeds from Maiden Lane III for the purchase of such CDOs, but which are not listed on Annex B).

2.     All of the allegations contained in this Complaint are based on Relator's direct knowledge of Defendants wrongdoing.  Relator gained this knowledge both from his professional experience and from his discovery of Defendants' mortgage loans and the related collateral properties.   Relator's investigation and discovery of the loans and properties on which the complaint is based requires a unique blend of relator's experience and knowledge of the mortgage security business and structured financial products. In addition, to discover the loans and properties in the Defendants RMBS, relator had to create and invent unique algorithms, methods, techniques, strategies to find and identify loans hidden from persons of average capability. The process was extremely lengthy and time consuming. After locating and identifying loans and properties in Defendants RMBS, even more time was consumed devising and creating a method of presenting the enormous amount of information so that a person of average capability could understand what occurred.

3.     Relator was an employee of a competitor of Defendants during the period 2000-2002. Through that employment, Relator came to know of the mortgage, mortgage security, CDO and Credit Default Swap businesses, the various competitors and their

practices within each and the trends in each business. Relator gained knowledge of his
employer's and its competitors practices for originating mortgages (directly and through
correspondents), creating mortgage securities, creating CDOs, writing and trading Credit
Defaults Swaps, and profiting from each business.

4.     Relator learned of diminishing standards in the mortgage and mortgage security
businesses during mid-2002 when an executive from his employer's mortgage security
group asked Relator for his help creating a competitive advantage by resolving tax issues
involving such mortgage securities. To perform this work task, Relator did a complete
analysis of the RMBS business, the competitors and its trends. Specifically, relator
learned the details of the "whole loan" and "wholesale" mortgage business. Relator's
work task made him aware that the creditworthiness of the mortgage borrowers and the
value of the collateral properties were secondary and tertiary considerations. To
paraphrase an executive of his employer: "we don't care about the borrower or the
property since we aren't holding the loan. We are packaging the loans into a security and
selling it as a blind pool to investors. We are only concerned about the volume. [This
particular originator] said he can deliver us 400 loans per month, which is all we are
concerned about."

5.     Relator learned of the packaging of unsellable securities (including RMBS
securities) into CDOs during 2000-2 in his tenure in his employer's CDO and Credit
Default Swap group (Structured Transactions). Relator's business unit was involved in
the Enron transactions and when that business fell apart, the group quickly moved on to
creating CDOs from piles of unsellable securities (including RMBS). Unsellable
securities arose from a number of issues, including lack of liquidity or a market, mis-

3

pricing (too expensive or too cheap); undesirable credit, etc. The explosion in CDO offerings began at the end of Relator's tenure in the group and continued unchecked in step with the growth of RMBS issuance. From this job, Relator knew of the activities of his own group as well as the activities of most (if not all) of its competitors.

6.　　　　Relator learned of the RMBS business failing to transfer mortgage loans to RMBS trusts around 2001. A former analyst of his employer made an off hand comment "Do you think mortgage security investors would be upset if they found out there were no mortgages in their mortgage-backed securities?" This prompted relator's inquiry about the fledging use of MERS (mortgage electronic recording system) and how mortgage transfers occurred "off the radar" of the county clerks, since no mortgage loan assignments were recorded.

**Department of Justice asked relator to be a "whistleblower"**

7.　　　　Based on information provided by Relator, the Department of Justice ("DOJ") approached Relator during January 2013 and asked him to be a whistleblower against at least 10 investment banks involved in the mortgage and RMBS businesses. At the time, the DOJ, to paraphrase the Assistant US Attorney's words, had nothing on them. Deutsche Bank was one of those investment banks. This case is a follow-on to that whistleblower request.

8.　　　　All of the allegations contained in this Complaint are derived from Relator's discovery and independent knowledge of the loans packaged into the DB RMBS (or sold directly to Fannie Mae, Freddie Mac, Wells Fargo or IndyMac). Defendants intentionally concealed the name and address of each individual borrower and the address of the

4

collateral property. Defendants' fraud was possible only because of their concealment of the names of the borrowers and the addresses of the collateral properties.

9.      Relator's discovery has uncovered that Defendants knowingly made false statements and claims and/or omitted material information concerning the sale of RMBS and CDOs to the U.S. Government.[2] Defendants' offering documents and related sales materials purportedly summarized and set forth the quality and condition of the borrowers and properties which backed the RMBS and CDO securities. This complaint sets forth ample evidence demonstrating on a loan-level basis. the falsity of Defendants' statements regarding the RMBS and CDO securities. Relator's discovery also revealed that Defendants' fraudulently induced purchasers by knowingly including false information regarding the borrowers and collateral properties.

10.     Defendants created and used false records and/or statements in connection with the creation and sale of RMBS and CDOs and presented and/or caused to be presented false or fraudulent claims for payment in connection therewith. Defendants' material omissions (and false statements) regarding their RMBS and CDOs have never been retracted and have endured in form and effect to the present. Thus all financing, guarantees, insurance, and payments associated with Defendants' RMBS and CDOs were made further to and in view of Defendants' false statements.

11.     The evidence Relator has found demonstrates that, in connection with Defendants' RMBS and CDOs, Defendants acted with knowledge and/or reckless disregard for the

---

[2] As used herein, "sales of CDOs to the US Government" includes the sale of credit protection by AIG to DB on the CDOs and the sales by DB to Maiden Lane III of the CDOs for which DB purchased credit protection from AIG as described herein.

truth by omitting material information and/or making false statements in the offering documents.[3]

12.      Defendants intentionally concealed the names of the borrowers and the addresses of  collateral properties securing the loans so that purchasers, including the United States, could not conduct their own due diligence.  Examination of the underlying loans shows Defendants knew or recklessly disregarded that most of the borrowers were not creditworthy. By concealing the name of a borrower, no one could determine a borrowers' ability to repay their mortgage loan(s).  Instead, purchasers could rely only on Defendants' representations (which led purchasers to believe the borrowers were creditworthy). Furthermore, Defendants represented that the underlying mortgage loans were sound, when they were not. In addition, Defendants claimed the loans complied with specified standards, when they did not.

13.      Relator's information reveals that many of the properties included as collateral in the DB RMBS were grossly and recklessly overvalued (by Defendants). Examination of the collateral properties shows that most of them were worth a fraction of the loan amount. In the event of a borrower's default (as it transpired) the collateral properties provided little   (and sometimes no security) for the loan. However, Defendants intentionally concealed this information from purchasers.  In addition, they made false statements in the RMBS and CDO offering documents about the collateral properties' values.

---

[3] As used herein, "with reckless disregard" or "recklessly" means "knowingly, with deliberate ignorance and/or with reckless disregard."

14.     Relator's discovery of the loans reveals that Defendants fraudulently misrepresented fundamental information necessary for a potential investor to conduct a proper valuation of a mortgage backed security. The process of discovering the loans is an art form onto itself. For example, Defendant's did not provide an loan lists ("loan tapes") of the loans in their RMBS. Relator had to find such lists from alternative sources, but always without the name of the borrower or address of the collateral property. To find the borrower and the collateral property, relator devised a reverse triangulation method. One example of the reverse triangulation is demonstrated by relator's algorithm for Orange County, Florida (Orlando). Florida imposes a ad valorem document tax on mortgages, so relator approached the Orange County recorder to see if it was possible to find a document using the amount of the document tax. This was arranged under the recorders system, and relator would search for mortgages by amount using the amount of the document tax. Relator would use other data points from his loan lists to refine the search process (e.g.  state, coutny, date of loan, maturity date, interest rate, zip code of property, etc.) By this process, Relator was able to refine his search results so the resulting pool could be manually reviewed. The process became self-validating, as once the name of the borrower was identified, records were searched for indications the loan was part of the relevant RMBS pool. At this step, foreclosure records in the name of an RMBS trust are an example of self-validation. This is an example of one methodology in one county. There are over 3000 county recorders in the United States, so the potential number of solutions to finding every loan is high, but not insurmountable.

7

15.     Also, contrary to Defendants' representations in the RMBS offering documents, Relator's information demonstrates that, in most cases, Defendants rarely, if ever, delivered the original note or an assignment on a timely basis. Without the original note or a valid assignment in recordable form, the DB RMBS trusts are unable to foreclose in the event of a default. See for example, Exhibits E, F and G of this complaint.

16.     Defendants not only failed to disclose these problems (including, by failing to file updates to any offering documents) but also actively concealed these problems from purchasers, including the U.S Government.

17.     The U.S. Government relied on the offering documents when purchasing or otherwise acquiring the RMBS and CDOs. The U.S. Government financed, insured or guaranteed, directly or indirectly, the purchase of Defendants' RMBS and CDOs, including purchases by the Failed Credit Unions, the Failed Banks, the Failed Pension Plans, the FRBNY, PPIFs, the Maiden Lane Entities, the Federal Home Loan Banks, American International Group, Inc. and Fannie Mae and Freddie Mac (each defined in paragraph 46 below). Each of those Government Purchasers purchased, insured or otherwise acquired billions of dollars of the RMBS and CDOs with funding provided by the U.S. Government, and through direct purchases and guarantees funded by the Federal Reserve System, the central banking system of the United States (the "Federal Reserve") and the U.S. Treasury (the "Treasury"). The U.S. Government has suffered losses as a consequence.

**A. RELATOR'S INFORMATION**

18.     As mentioned in paragraph 14, Relator independently gathered and reviewed thousands of notes and mortgages backing Defendants' RMBS deals and thousands of

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------

UNITED STATES OF AMERICA, ex rel.
JOSEPH AMICO

                       Plaintiff/Relator,

      against

DEUTSCHE BANK AG; DB STRUCTURED
PRODUCTS, INC.; DEUTSCHE BANK
SECURITIES INC.; DB HOME LENDING LLC;
DB HOME LENDING HOLDINGS LLC;
MORTGAGEIT, INC.; DEUTSCHE ALT-A
SECURITIES, INC.; ALTAMONT HOLDINGS
CORP.; MORTGAGEIT SECURITIES CORP.; ACE
SECURITIES CORP.; DEUTSCHE BANK
NATIONAL TRUST COMPANY;

                    Defendants.

-----------------------------------------------------------------

FILED UNDER SEAL

**15 CV 9551**

_____ CIV _____

**COMPLAINT**

JURY TRIAL DEMANDED

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------

UNITED STATES OF AMERICA, ex rel.
JOSEPH AMICO

                                  Plaintiff/Relator,

    against

DEUTSCHE BANK AG; DB STRUCTURED
PRODUCTS, INC.; DEUTSCHE BANK
SECURITIES INC.; DB HOME LENDING LLC;
DB HOME LENDING HOLDINGS LLC;
MORTGAGEIT, INC.; DEUTSCHE ALT-A
SECURITIES, INC.; ALTAMONT HOLDINGS
CORP.; MORTGAGEIT SECURITIES CORP.; ACE
SECURITIES CORP.; DEUTSCHE BANK
NATIONAL TRUST COMPANY;

                          Defendants.

---------------------------------------------------------------

FILED UNDER SEAL

15 CV 9551

_____ CIV _____

**COMPLAINT**

JURY TRIAL DEMANDED

# TABLE OF CONTENTS

Page

NATURE OF ACTION ................................................................................................................. 1

    A. RELATOR'S  INFORMATION.................................................................................. 8

PARTIES ................................................................................................................................... 15

    A.     THE PLAINTIFF................................................................................................. 15

    B.  THE RELATOR ................................................................................................... 15

    C.  THE DEFENDANTS............................................................................................. 16

    D.  THE NON-PARTY ORIGINATORS........................................................................ 18

    E.  THE GOVERNMENT PURCHASERS .................................................................... 19

JURISDICTION AND VENUE ................................................................................................... 19

CONDITIONS PRECEDENT ...................................................................................................... 20

FACTS COMMON TO ALL COUNTS......................................................................................... 21

    A.     MBS BACKGROUND ........................................................................................ 22

    B.  THE DB RMBS PROCESS................................................................................... 24

    C.  THE DB CDO PROCESS  ................................................................................... 28

    D.  RELATOR'S  REVIEW  OF  THE  BORROWERS  AND  COLLATERAL
        PROPERTIES REVEALS FRAUD ........................................................................ 29

    E.  BORROWERS AND COLLATERAL PROPERTIES ................................................. 32

    F.  DEFENDANTS  FAILED  TO  APPROPRIATELY  TRANSFER  LOANS
        TO THE MBS TRUSTS ....................................................................................... 51

DEFENDANTS' USE OF FALSE RECORDS AND/OR STATEMENTS ................................. 53

    A.     DEFENDANTS USE OF REGISTRATION STATEMENTS AND OFFERING
        DOCUMENTS TO FURTHER THEIR SCHEME ................................... 53

    B.  DEFENDANTS  USED  NON-DELIVERY  OF  LOAN  DOCUMENTS  TO
        CONCEAL  UNRELIABLE  BORROWERS  AND  OVERVALUED
        PROPERTIES ...................................................................................................... 61

D. DEFENDANTS FAILED TO COMPLY WITH UNDERWRITING GUIDELINES DESPITE REPRESENTING THEY WOULD IN THE OFFERING DOCUMENTS ............................................................................................. 64

E. DEFENDANTS OMITTED AND MISREPRESENTED MATERIAL INFORMATION IN THE OFFERING DOCUMENTS FOR THE CDOS ... 74

    1.    DB PURCHASED CREDIT PROTECTION FROM AIG AND SOLD CDOS TO MAIDEN LANE III ................................................... 76

F. DEFENDANTS CONTROLLED AND DIRECTED EVERY STEP OF THE SECURITIZATION PROCESS ...................................................... 78

G.    SALES OF RMBS TO AIG UNDER AIG'S SECURITIES LENDING PROGRAM AND FALSE STATEMENTS MADE IN CONNECTION THEREWITH ......................................................................... 80

H.    DIRECT LOAN SALES TO FHLMC AND FNMA AND FALSE STATEMENTS MADE IN CONNECTION THEREWITH ................. 81

I.    DIRECT LOAN SALES TO INDYMAC & WELLS FARGO AND FALSE STATEMENTS MADE IN CONNECTION THEREWITH ................. 84

THE U.S. GOVERNMENT FUNDED THE PURCHASE OF MBS AND CDOS AND SUFFERED SUBSTANTIAL LOSSES ......................................................... 85

A.    PURCHASES BY THE U.S. GOVERNMENT .................................... 85

B. DAMAGES TO THE U.S. GOVERNMENT IMPAIRED VALUE OF MBS ......... 86

    1.    IMPAIRED VALUE OF MBS .................................................. 86

    2.    IMPAIRED VALUE OF CDOS ................................................ 89

    3.    DAMAGE TO FANNIE MAE AND FREDDIE MAC .......................... 89

    4.    DAMAGES TO THE FAILED CREDIT UNIONS, THE FAILED BANKS, THE FAILED PENSION PLANS ................................. 90

    5.    DAMAGES FROM AIG BAILOUT......................................... 91

CLAIMS FOR RELIEF ................................................................................. 92

A.    For Damages And Penalties Under The False Claims Act (31 U.S.C. § 3729(a)(1) (2006), and, as amended, 31 U.S.C. § 3729(a)(1)(A)).......................................................................... 92

B.    FOR DAMAGES AND PENALTIES UNDER THE FALSE CLAIMS ACT U.S.C. § 3729(a)(2)(2006), and, as amended, 31 U.S.C. § 3729(a)(1)(B) ............................................................................................ 95

C.    FOR DAMAGES AND PENALTIES UNDER THE FALSE CLAIMS ACT (31 U.S.C. § 3729(a)(7)(2006), and, as amended, 31 U.S.C. § 3729(a)(1)(G)) ........................................................................................... 97

PRAYER FOR RELIEF .............................................................................................. 98

DEMAND FOR TRIAL BY JURY .............................................................................. 99

ANNEX A .................................................................................................................. 100

ANNEX B .................................................................................................................. 106

ANNEX C .................................................................................................................. 107

ANNEX D .................................................................................................................. 111

The United States of America, by and through Joseph C. Amico as Relator, brings this action against Defendants DEUTSCHE BANK AG; DB STRUCTURED PRODUCTS, INC. ("DB Structured Products"); DEUTSCHE BANK SECURITIES INC. ("DB Securities"); DB HOME LENDING LLC ("DBHL"); DB HOME LENDING HOLDINGS LLC ("DBHL Holdings"); MORTGAGEIT, INC. ("MortgageIT"); DEUTSCHE ALT-A SECURITIES, INC. ("DBALT"); ALTAMONT HOLDINGS CORP. ("Altamont Holdings"); MORTGAGEIT SECURITIES CORP. ("MITSC"); ACE SECURITIES CORP. ("ACE"); and DEUTSCHE BANK NATIONAL TRUST COMPANY (collectively or individually, "DB" or "Defendants") alleging as follows:

## **NATURE OF ACTION**

1.     This is an action under the False Claims Act ("FCA") by the United States of America, as related by Joseph C. Amico, to recover treble damages and civil penalties under the False Claims Act, as amended, 31 U.S.C. §§ 3729 et seq.[1] arising from Defendants' creation and sale of certain residential mortgage-backed securities ("RMBS," or generally, "MBS") and collateralized debt obligations ("CDOs") and the purchase of those securities using funds provided, insured, guaranteed or otherwise made available by the United States Government ("US Government"). The MBS covered by this Complaint are set forth on Annex A (Annex A is deemed to include both (i) all other MBS for which Defendants served as underwriter/placement agent, and (ii) third-party MBS for which MortgageIT or DBHL acted as originator and which included a

---

[1] This action is brought pursuant to both the FCA as it stood prior to the enactment of the Fraud Enforcement and Recovery Act of 2009 (the "FERA") and the FCA as amended by the FERA. Defendants' false and fraudulent statements and/or omission were made for the first time prior to 2009, have never been retracted or corrected and endure in form and effect to the present. This Complaint includes claims relating to the U.S. Government's financing, insuring, and guaranteeing of MBS and CDOs both before and after 2009.

description of MorgageIT or DBHL and its underwriting standards in the related prospectus supplement for such third-party MBS, but which are not listed on Annex A). The CDOs covered by this Complaint are set forth on Annex B (Annex B is deemed to include all other CDOs for which Defendants served as underwriter/placement agent and CDOs for which Defendants purchased credit protection from AIG and received proceeds from Maiden Lane III for the purchase of such CDOs, but which are not listed on Annex B).

2.        All of the allegations contained in this Complaint are based on Relator's direct knowledge of Defendants wrongdoing. Relator gained this knowledge both from his professional experience and from his discovery of Defendants' mortgage loans and the related collateral properties.    Relator's investigation and discovery of the loans and properties on which the complaint is based requires a unique blend of relator's experience and knowledge of the mortgage security business and structured financial products. In addition, to discover the loans and properties in the Defendants RMBS, relator had to create and invent unique algorithms, methods, techniques, strategies to find and identify loans hidden from persons of average capability. The process was extremely lengthy and time consuming. After locating and identifying loans and properties in Defendants RMBS, even more time was consumed devising and creating a method of presenting the enormous amount of information so that a person of average capability could understand what occurred.

3.        Relator was an employee of a competitor of Defendants during the period 2000-2002. Through that employment, Relator came to know of the mortgage, mortgage security, CDO and Credit Default Swap businesses, the various competitors and their

practices within each and the trends in each business. Relator gained knowledge of his
employer's and its competitors practices for originating mortgages (directly and through
correspondents), creating mortgage securities, creating CDOs, writing and trading Credit
Defaults Swaps, and profiting from each business.

4.      Relator learned of diminishing standards in the mortgage and mortgage security
businesses during mid-2002 when an executive from his employer's mortgage security
group asked Relator for his help creating a competitive advantage by resolving tax issues
involving such mortgage securities. To perform this work task, Relator did a complete
analysis of the RMBS business, the competitors and its trends. Specifically, relator
learned the details of the "whole loan" and "wholesale" mortgage business. Relator's
work task made him aware that the creditworthiness of the mortgage borrowers and the
value of the collateral properties were secondary and tertiary considerations. To
paraphrase an executive of his employer: "we don't care about the borrower or the
property since we aren't holding the loan. We are packaging the loans into a security and
selling it as a blind pool to investors. We are only concerned about the volume. [This
particular originator] said he can deliver us 400 loans per month, which is all we are
concerned about."

5.      Relator learned of the packaging of unsellable securities (including RMBS
securities) into CDOs during 2000-2 in his tenure in his employer's CDO and Credit
Default Swap group (Structured Transactions). Relator's business unit was involved in
the Enron transactions and when that business fell apart, the group quickly moved on to
creating CDOs from piles of unsellable securities (including RMBS). Unsellable
securities arose from a number of issues, including lack of liquidity or a market, mis-

pricing (too expensive or too cheap); undesirable credit, etc. The explosion in CDO offerings began at the end of Relator's tenure in the group and continued unchecked in step with the growth of RMBS issuance. From this job, Relator knew of the activities of his own group as well as the activities of most (if not all) of its competitors.

6.      Relator learned of the RMBS business failing to transfer mortgage loans to RMBS trusts around 2001. A former analyst of his employer made an off hand comment "Do you think mortgage security investors would be upset if they found out there were no mortgages in their mortgage-backed securities?" This prompted relator's inquiry about the fledging use of MERS (mortgage electronic recording system) and how mortgage transfers occurred "off the radar" of the county clerks, since no mortgage loan assignments were recorded.

**Department of Justice asked relator to be a "whistleblower"**

7.      Based on information provided by Relator, the Department of Justice ("DOJ") approached Relator during January 2013 and asked him to be a whistleblower against at least 10 investment banks involved in the mortgage and RMBS businesses. At the time, the DOJ, to paraphrase the Assistant US Attorney's words, had nothing on them. Deutsche Bank was one of those investment banks. This case is a follow-on to that whistleblower request.

8.      All of the allegations contained in this Complaint are derived from Relator's discovery and independent knowledge of the loans packaged into the DB RMBS (or sold directly to Fannie Mae, Freddie Mac, Wells Fargo or IndyMac). Defendants intentionally concealed the name and address of each individual borrower and the address of the

4

collateral property. Defendants' fraud was possible only because of their concealment of the names of the borrowers and the addresses of the collateral properties.

9.       Relator's discovery has uncovered that Defendants knowingly made false statements and claims and/or omitted material information concerning the sale of RMBS and CDOs to the U.S. Government.[2] Defendants' offering documents and related sales materials purportedly summarized and set forth the quality and condition of the borrowers and properties which backed the RMBS and CDO securities. This complaint sets forth ample evidence demonstrating on a loan-level basis. the falsity of Defendants' statements regarding the RMBS and CDO securities. Relator's discovery also revealed that Defendants' fraudulently induced purchasers by knowingly including false information regarding the borrowers and collateral properties.

10.       Defendants created and used false records and/or statements in connection with the creation and sale of RMBS and CDOs and presented and/or caused to be presented false or fraudulent claims for payment in connection therewith. Defendants' material omissions (and false statements) regarding their RMBS and CDOs have never been retracted and have endured in form and effect to the present. Thus all financing, guarantees, insurance, and payments associated with Defendants' RMBS and CDOs were made further to and in view of Defendants' false statements.

11.       The evidence Relator has found demonstrates that, in connection with Defendants' RMBS and CDOs, Defendants acted with knowledge and/or reckless disregard for the

_____

[2] As used herein, "sales of CDOs to the US Government" includes the sale of credit protection by AIG to DB on the CDOs and the sales by DB to Maiden Lane III of the CDOs for which DB purchased credit protection from AIG as described herein.

truth by omitting material information and/or making false statements in the offering documents.[3]

12.     Defendants intentionally concealed the names of the borrowers and the addresses of collateral properties securing the loans so that purchasers, including the United States, could not conduct their own due diligence. Examination of the underlying loans shows Defendants knew or recklessly disregarded that most of the borrowers were not creditworthy. By concealing the name of a borrower, no one could determine a borrowers' ability to repay their mortgage loan(s). Instead, purchasers could rely only on Defendants' representations (which led purchasers to believe the borrowers were creditworthy). Furthermore, Defendants represented that the underlying mortgage loans were sound, when they were not. In addition, Defendants claimed the loans complied with specified standards, when they did not.

13.     Relator's information reveals that many of the properties included as collateral in the DB RMBS were grossly and recklessly overvalued (by Defendants). Examination of the collateral properties shows that most of them were worth a fraction of the loan amount. In the event of a borrower's default (as it transpired) the collateral properties provided little   (and sometimes no security) for the loan. However, Defendants intentionally concealed this information from purchasers.  In addition, they made false statements in the RMBS and CDO offering documents about the collateral properties' values.

---

[3] As used herein, "with reckless disregard" or "recklessly" means "knowingly, with deliberate ignorance and/or with reckless disregard."

15.     Also, contrary to Defendants' representations in the RMBS offering documents,
Relator's information demonstrates that, in most cases, Defendants rarely, if ever,
delivered the original note or an assignment on a timely basis. Without the original note
or a valid assignment in recordable form, the DB RMBS trusts are unable to foreclose in
the event of a default. See for example, Exhibits E, F and G of this complaint.

16.     Defendants not only failed to disclose these problems (including, by failing to file
updates to any offering documents) but also actively concealed these problems from
purchasers, including the U.S Government.

17.     The U.S. Government relied on the offering documents when purchasing or
otherwise acquiring the RMBS and CDOs. The U.S. Government financed, insured or
guaranteed, directly or indirectly, the purchase of Defendants' RMBS and CDOs,
including purchases by the Failed Credit Unions, the Failed Banks, the Failed Pension
Plans, the FRBNY, PPIFs, the Maiden Lane Entities, the Federal Home Loan Banks,
American International Group, Inc. and Fannie Mae and Freddie Mac (each defined in
paragraph 46 below). Each of those Government Purchasers purchased, insured or
otherwise acquired billions of dollars of the RMBS and CDOs with funding provided by
the U.S. Government, and through direct purchases and guarantees funded by the Federal
Reserve System, the central banking system of the United States (the "Federal Reserve")
and the U.S. Treasury (the "Treasury"). The U.S. Government has suffered losses as a
consequence.

**A. RELATOR'S INFORMATION**

18.     As mentioned in paragraph 14, Relator independently gathered and reviewed
thousands of notes and mortgages backing Defendants' RMBS deals and thousands of

documents relating to the underlying borrowers and the properties securing the mortgage notes backing the RMBS deals.

19.      Relator also reviewed loan schedules obtained from non-public 3rd party sources (which omitted the names of the borrowers and the addresses of the collateral properties) in order to evaluate the veracity of Defendants' offering documents.  Using data on the loan schedules and other methods, Relator discovered records of borrowers and properties and uncovered the shoddy lending behind the RMBS securities.

20.      Defendants represented to investors that the loans underlying the MBS complied with various guidelines and standards.  Defendants publicly stated that: (a) the borrowers were well vetted and creditworthy, (b) Defendants conducted due diligence on the loan portfolios included in its MBS trusts, (c) loans purchased from third party sellers met certain standards, and (d) collateral properties were valued according to independent standards and provided adequate collateral for the loans.  Discovery of the loan and collateral property reveals most (if not all) of these statements were false or misleading.

21.      Relator's information also reveals that Defendants included multiple loans from the same borrower (and secured by units in the same development) in the MBS trusts without disclosing this material fact to investors.   Defendants omitted material information regarding the concentration of loans secured by units in the same development.

22.      As a matter of practice, Defendants never provided MBS investors with borrower names or collateral property addresses.  In fact, Defendants built safeguards into their MBS marketing system to prevent such information from being given to an inquiring investor.

23.     For example, the loan schedule was listed as a schedule to the Pooling and

Servicing Agreements that Defendants filed as part of the Registration Statements.

However, instead of attaching the loan schedule where the loan schedule should have

been, the filed Pooling and Servicing Agreements stated "PROVIDED UPON

REQUEST."  The Pooling and Servicing Agreements gave the impression that someone

who asked would be provided with the loan schedule.  However, Relator's information

(i.e. we called up the Defendants and asked for the information) reveals that a person who

requested the loan schedule would be given the runaround to dissuade them from

obtaining the loan schedules and, in fact, would not be given the loan schedule by

Defendants even after multiple requests.  It is possible that an extremely persistent person

might have obtained a loan schedule, but relator is not aware of any such person.  And if

such an extremely persistent person did obtain a loan schedule, Defendants would only

provide a loan schedule that did not include the names of the borrowers or the addresses

of the collateral properties.

24.     Defendants designed this scheme so that they would not have to disclose the loan

schedule publicly, and would only provide the loan schedule (without names of

borrowers or addresses of collateral properties) to an extremely persistent person who

survived any hurdles Defendants put up.  As described below, Defendants included false

statements on the offering documents (e.g., that the mortgage loans were originated to

stringent standards) to induce people not to ask for the loan schedules.

25.     Defendants' "no loan tape" scheme was designed as a legal trap to allow

Defendants to maintain that the loan tapes were publicly disclosed when in fact they were

not. If Defendants were ever sued, then Defendants would produce the complete loan

documents relating to the underlying borrowers and the properties securing the mortgage notes backing the RMBS deals.

19.     Relator also reviewed loan schedules obtained from non-public 3rd party sources (which omitted the names of the borrowers and the addresses of the collateral properties) in order to evaluate the veracity of Defendants' offering documents.  Using data on the loan schedules and other methods, Relator discovered records of borrowers and properties and uncovered the shoddy lending behind the RMBS securities.

20.     Defendants represented to investors that the loans underlying the MBS complied with various guidelines and standards.  Defendants publicly stated that: (a) the borrowers were well vetted and creditworthy, (b) Defendants conducted due diligence on the loan portfolios included in its MBS trusts, (c) loans purchased from third party sellers met certain standards, and (d) collateral properties were valued according to independent standards and provided adequate collateral for the loans.  Discovery of the loan and collateral property reveals most (if not all) of these statements were false or misleading.

21.     Relator's information also reveals that Defendants included multiple loans from the same borrower (and secured by units in the same development) in the MBS trusts without disclosing this material fact to investors.  Defendants omitted material information regarding the concentration of loans secured by units in the same development.

22.     As a matter of practice, Defendants never provided MBS investors with borrower names or collateral property addresses.  In fact, Defendants built safeguards into their MBS marketing system to prevent such information from being given to an inquiring investor.

23.     For example, the loan schedule was listed as a schedule to the Pooling and Servicing Agreements that Defendants filed as part of the Registration Statements. However, instead of attaching the loan schedule where the loan schedule should have been, the filed Pooling and Servicing Agreements stated "PROVIDED UPON REQUEST." The Pooling and Servicing Agreements gave the impression that someone who asked would be provided with the loan schedule. However, Relator's information (i.e. we called up the Defendants and asked for the information) reveals that a person who requested the loan schedule would be given the runaround to dissuade them from obtaining the loan schedules and, in fact, would not be given the loan schedule by Defendants even after multiple requests. It is possible that an extremely persistent person might have obtained a loan schedule, but relator is not aware of any such person. And if such an extremely persistent person did obtain a loan schedule, Defendants would only provide a loan schedule that did not include the names of the borrowers or the addresses of the collateral properties.

24.     Defendants designed this scheme so that they would not have to disclose the loan schedule publicly, and would only provide the loan schedule (without names of borrowers or addresses of collateral properties) to an extremely persistent person who survived any hurdles Defendants put up. As described below, Defendants included false statements on the offering documents (e.g., that the mortgage loans were originated to stringent standards) to induce people not to ask for the loan schedules.

25.     Defendants' "no loan tape" scheme was designed as a legal trap to allow Defendants to maintain that the loan tapes were publicly disclosed when in fact they were not. If Defendants were ever sued, then Defendants would produce the complete loan

10

schedule (that included the names of the borrowers and the addresses of the collateral properties) as a defense in order to escape liability. Thus, Defendants were able to hide the defective loans from investors while trying to avoid any liability for doing so.

26.         Defendants' obfuscation ensured that investors would not be able to conduct their own due diligence on the mortgage loans and make their own judgments about borrowers' ability to repay their loans and the value of properties securing such loans. This obfuscation also made it impossible for investors to determine if the information Defendants provided in the offering documents was accurate. The correct and complete information was available to the Defendants but Defendants intentionally concealed this information from potential MBS purchasers.

27.         Omitting borrower names and collateral property addresses from the loan schedules (which DB did not provided to investors in the first place) prevented MBS investors from discovering the borrowers' inability to repay their loans, the overvaluation of properties securing such loans and the undisclosed concentrations of risk in certain borrowers or certain properties (because an RMBS trust contained multiple loans from the same borrower or loans secured by properties in the same development).

28.         Relator's information reveals that Defendants used a nominee (MERS) in order further the practice of concealing the names of borrowers and the addresses of collateral properties since the vast majority of mortgage loans originated by DB and that purportedly served as collateral for the MBS used a nominee. If the mortgages were recorded in the name of DB and the assignments of the mortgages were delivered and recorded as provided in the registration statements, an investor could search the public records and find the loans originated by DB and assigned to the applicable DB trust. By

11