G.    SALES OF RMBS TO AIG UNDER AIG'S SECURITIES LENDING
      PROGRAM AND FALSE STATEMENTS MADE IN CONNECTION
      THEREWITH

212.    During the period that Defendants were issuing RMBS using false Offering

Documents as described herein, DB also entered into securities lending arrangements

with AIG which permitted DB to sell RMBS to AIG with funds provided by DB.  In a

securities lending transaction, the lender (in this case DB) lends money to a borrower

with certain securities as collateral and the borrower (in this case AIG) receives cash.  In

a typical transaction in a normal market environment, AIG typically received cash equal

to or exceeding the value of the securities deposited with DB as collateral.  AIG

reinvested the cash it received from DB in order to earn a profit on the transaction.  As it

transpired, DB and others convinced AIG to reinvest that cash in RMBS.

213.    Before the financial crisis, AIG was active in the securities lending market and

was a favorable counterparty because it had a strong credit rating.  Because of its credit

rating and the high quality of its securities portfolio, AIG could borrow cash very cheaply

through securities lending transactions.  Lenders would often provide AIG cash equal to

100% or more of the value of the collateral security.  During the period from 2005 to

2007, AIG increased the size of its securities lending program and invested a majority of

the cash in MBS, including MBS issued by DB.  Since MBS have long durations, AIG's

investment in MBS created a maturity mismatch – the maturity dates of the MBS were

long but the terms of the securities loans which generated the cash for AIG to buy the

MBS were short.  Prior to the financial crisis, AIG's counterparties would routinely

renew these securities loans and not demand changes in the terms of the transactions.

When the financial crisis started, DB and others extracted stiffer terms from AIG,

including a higher interest rate on the cash and more collateralization.

214.     DB was one of AIG's largest securities lending counterparties by and a major vendor of MBS to it.  DB knew that AIG was using the funds it received from DB to purchase DB MBS.  As demonstrated by Relator's information, DB knew that the DB MBS that AIG purchased with the proceeds of its securities lending program in reliance on the material omissions and misrepresentations on the Offering Documents were defective and were declining in value.  DB knew that AIG could not repay securities borrowers in the event AIG was forced to sell the DB MBS in order to repay securities borrowers.  Therefore, DB demanded better terms, both in terms of rates and amount of cash collateral, because it knew that AIG had purchased DB MBS.  In order to repay DB and other securities borrowers, AIG was forced to sell MBS, including the DB MBS that it purchased in reliance on the material omissions and misrepresentations in the Offering Documents, at a loss.

215.     On October 3, 2008, AIG received a $37.8 billion bailout from the Treasury under the Troubled Asset Relief Program (TARP) so that AIG could pay back AIG's securities lending counterparties.  In connection with DB's securities lending arrangements with AIG, DB received $6.4 *billion* from the Government's bailout of AIG (this is in addition to the $5.4 *billion* that DB received for the CDOs).

### H.     DIRECT LOAN SALES TO FHLMC AND FNMA AND FALSE STATEMENTS MADE IN CONNECTION THEREWITH

216.     Relator's discovery demonstrates that DB and its affiliates sold defective mortgage loans to both Freddie Mac and Fannie Mae.  Relator has reviewed hundreds of mortgage loans that DB sold to the GSEs and has determined that such loans were originated using inflated values and that DB made misrepresentations to the GSEs as to the underwriting, origination and quality of such mortgage loans.  In addition, Relator has

determined that DB and its affiliates breached representations and warranties by failing to report thousands of defective loans it sold to the GSEs.

217.     In selling residential mortgage loans to the GSEs, DB made representations and warranties to the GSEs that the loans complied in all respects with the standards outlined in the Single Family Selling Guide (the "Fannie Guide"), Single-Family Seller/Servicer Guide (the "Freddie Guide"), and the applicable purchase contracts, which collectively set forth underwriting, documentation, quality control, and self-reporting requirements.

218.     DB made representations and warranties, none of which have been retracted, to Fannie Mae concerning each residential mortgage loan that it originated and sold to Fannie Mae, including but not limited to, the following:

     (a)     The mortgage conformed to all the applicable requirements in the Fannie Guide and the purchase contracts;

     (b)     The mortgage was an "acceptable investment";

     (c)     All required loan data was true, correct, and complete;

     (d)     Automated underwriting conditions were met for loans processed through an automated underwriting system; and

     (e)     No fraud or material misrepresentation was committed by any party, including the borrower.

219.     DB made similar representations and warranties, none of which have been retracted, to Freddie Mac concerning each residential mortgage loan they originated and sold to Freddie Mac, including, but not limited to, the following:

     (a)     The terms, conditions, and requirements stated in the Freddie Guide and purchase contracts were fully satisfied;

     (b)     All warranties and representations of DB were true and correct;

     (c)     The loan was "investment quality"; and

     (d)     DB had not misstated or omitted any material fact about the mortgage.

220.     DB was also generally required to self-report to Fannie Mae and Freddie Mac any loans it identified as defective and/or otherwise ineligible for sale to the GSEs. DB's statements to Fannie Mae and Freddie Mac have never been retracted and have endured in form and effect to the present.

221.     Relator's discovery has revealed that DB, with reckless disregard, sold to the GSEs residential mortgage loans originated by DB or its affiliates which were defective and/or otherwise ineligible for sale to the GSEs. DB sold residential mortgage loans that it originated to the GSEs with representations and warranties (i) that the loans conformed to the Fannie Guide, Freddie Guide and/or applicable purchase contracts, (ii) that the loans were acceptable investments or investment quality, (iii) that all required loan data was true, correct, and complete, (iv) that automated underwriting conditions had been met; (v) that no material misrepresentations were committed in connection with the loans; and (vi) that they had not misstated or omitted any material fact about the loans; when, in fact, many of those representations or warranties were not accurate, as many of the loans were defective and/or otherwise ineligible for sale to the GSEs.

222.     DB also did not self-report to the GSEs mortgage loans originated by DB or its affiliates which were internally identified as defective and/or otherwise ineligible for sale to the GSEs. Defendants' alleged false and fraudulent statements were made for the first time prior to 2009 and have never been retracted and endure in form and effect to the present time. DB's failure to self report occurred after 2009 and continues to the present.

## I.   DIRECT LOAN SALES TO INDYMAC & WELLS FARGO AND FALSE STATEMENTS MADE IN CONNECTION THEREWITH

223.      Relator's discovery demonstrates that DB and its affiliates sold defective mortgage loans to IndyMac and Wells Fargo.  Relator has reviewed hundreds of mortgage loans that DB sold to IndyMac and Wells Fargo has determined that such loans were originated using inflated values and that DB made misrepresentations to these purchasers as to the underwriting, origination and quality of such mortgage loans.  In addition, Relator has determined that DB and its affiliates breached representations and warranties by failing to report thousands of defective loans it sold to IndyMac and Wells Fargo.

224.      Relator's discovery has revealed that DB, with reckless disregard, sold to IndyMac  and Wells Fargo residential mortgage loans originated by DB or its affiliates which were defective.  DB sold residential mortgage loans that it originated to IndyMac and Wells Fargo with representations and warranties (i) that the loans conformed to the applicable purchase contracts, (ii) that the loans were acceptable investments or investment quality, (iii) that all required loan data was true, correct, and complete, (iv) that no material misrepresentations were committed in connection with the loans; and (v) that they had not misstated or omitted any material fact about the loans; when, in fact, many of those representations or warranties were not accurate, as many of the loans were defective.  Defendants' false and fraudulent statements were made for the first time prior to 2009 and have never been retracted and endure in form and effect to the present time. DB's failure to self report occurred after 2009 and continues to the present.

## THE U.S. GOVERNMENT FUNDED THE PURCHASE OF MBS AND CDOS AND SUFFERED SUBSTANTIAL LOSSES

### A.   PURCHASES BY THE U.S. GOVERNMENT

225.   The U.S. Government purchased or financed the purchase of MBS and CDOs through many avenues, including, without limitation, through purchases by the Failed Credit Unions, the Failed Banks, the Failed Pension Plans, the FRBNY, the Federal Home Loan Banks, PPIFs, the Maiden Lane Entities, and Fannie Mae and Freddie Mac, who each purchased or otherwise acquired billions of dollars of the MBS and CDOs with funding provided by the U.S. Government, and through direct purchases by the Federal Reserve and the Treasury (collectively, the "Government Purchasers").

226.   The Failed Credit Unions, Failed Banks and Failed Pension Plans were each federally insured institutions and one or more of such entities purchased MBS and CDOs, either directly or indirectly (including purchase of other CDOs that contained MBS or CDOs as collateral).

227.   In 2008, to respond to the financial crisis, the Federal Reserve Board authorized the FRBNY to facilitate the formation of three Maiden Lane Entities, each of which is a separate limited liability company. The assets and liabilities of each Maiden Lane Entity are consolidated onto the books of the FRBNY and are essentially owned by the FRBNY. The Maiden Lane Entities purchased or acquired Defendants' MBS and CDOs.

228.   On March 23, 2009, the U.S. Treasury, in conjunction with the FDIC and the Federal Reserve Bank, announced the creation of the Public-Private Investment Partnership ("PPIP") of 2009, as a part of the government's Financial Stability Plan.

Under the PPIP, the Treasury provides equity and debt financing to newly-formed public-private investment funds ("PPIFs") established by fund managers with investors for the purpose of purchasing legacy securities from financial institutions. These securities include non-GSE RMBS.[15] The PPIF Managers purchased Defendants' MBS.

## B. DAMAGES TO THE U.S. GOVERNMENT IMPAIRED VALUE OF MBS

### 1.    IMPAIRED VALUE OF MBS

229.    Each of the Defendants named herein participated in originating and/or purchasing from third-party originators residential mortgage loans, which were included in the MBS trusts, and selling the MBS to investors, including to the U.S. Government, using the false records described herein. As set forth above, Defendants acting with reckless disregard of the truth, made false representations about the quality of the mortgage loans sold to the MBS trusts, including at the time the MBS were acquired by the U.S. Government. Such mortgage loans failed to conform to the underwriting standards of the originators and of the Defendants and failed to conform to the representations and warranties in the pooling and servicing agreements, trust agreements, assignment and assumption agreements and mortgage loan purchase agreements as disclosed in the Registration Statements and Offering Documents. Because of the false loan-level information, inflated values and other false records that Defendants provided to the rating agencies to obtain high credit ratings on the MBS, the investment grade

---

[15] According to a U.S. Treasury press release:

The PPIP is designed to encourage the transfer of certain illiquid legacy real estate-related assets off of the balance sheets of financial institutions, restarting the market for these assets and supporting the flow of credit and other capital into the broader economy. PPIP funds established under the legacy loan program will be established to purchase troubled loans from insured depository institutions and PPIP funds established under the legacy securities program to purchase from financial institutions legacy non-Agency RMBS and newly issued and legacy CMBS originally AAA rated. PPIFs will have access to equity capital from the U.S. Treasury as well as debt financing provided or guaranteed by the U.S. government.

MBS had inadequate subordination to absorb the massive losses from defective loans and collateral properties.

230.    In addition, each of the Defendants named herein participated in creating the MBS trusts that failed to include valid assignments or the original notes, and concealed such material fact from purchasers, including from the U.S. Government.  As described herein, the Registration Statement for each of the MBS states that the original notes and valid assignments would be delivered on the closing date for each MBS trust.

231.    Because of the missing assignments and original notes, in any foreclosure action, the MBS trust will be unable, or will have to expend significant funds, to prove that the trust is entitled to foreclose on the property.  This is true especially for mortgages that are held in the name of "MERS" because MERS is not the owner of the mortgage note and MERS as nominee cannot lawfully commence a foreclosure action.  The amount the MBS trusts will spend to prove they are entitled to foreclose is materially more than they would have spent if the Defendants delivered the original notes or a valid assignment in a timely manner as the Registration Statements stated had been done.  In addition, the value of the MBS must be discounted to account for the risk that a court may not recognize the MBS trust as the legal owner of the note and mortgage, and may deny foreclosure on the mortgaged property.  The cost to establish that the MBS trust is the owner of a note and mortgage is a financial harm to the U.S. Government, as a purchaser of the MBS.

232.    In all, as a result of Defendants' fraudulent conduct, the value of the MBS acquired and currently owned by the U.S. Government have been substantially impaired.

233.    The U.S. Government has realized losses on its purchases of MBS and CDOs as a result of Defendants' malfeasance.  For example, one of the Failed Credit Unions

purchased (i) $30,878,000 principal amount of the Class A-4 Certificates (CUSIP 25151RAF1) issued by DBALT 2007-AR1, (ii) $23,950,000 principal amount of the Class A-1 Certificates (CUSIP 25151UAA5) issued by DBALT 2007-AR2, and (iii) $12,000,000 principal amount of the Class A-2C Certificates (CUSIP 00441VAD0) issued by ACE 2006-FM1.

234.     The National Credit Union Administration, as Liquidating Agent, acquired such DBALT 2007-AR1, DBALT 2007-AR2 and ACE 2006-FM1 securities as legacy assets and securitized such assets as part of the NCUA Guaranteed Note Program. The NCUA transferred such securities to the NCUA Guaranteed Notes Trust 2011-R4 in or around April 2011 and payment on the notes issued by such trust is guaranteed by the NCUA and backed by the full faith and credit of the United States. Since April 2011, the NCUA has reported that (i) the $30,878,000 of Class A-4 Certificates of DBALT 2007-AR1 owned by the NCUA 2011-R4 trust have suffered cumulative realized losses of $5,555,221.96, (ii) the $23,950,000 of Class A-1 Certificates of DBALT 2007-AR2 owned by the NCUA 2011-R4 trust have suffered cumulative realized losses of $1,353,208.67 and (iii) the $12,000,000 of Class A-2C Certificates of ACE 2006-FM1 owned by the NCUA 2011-R4 trust have suffered cumulative realized losses of $4,817,044.74. As a result the NCUA has suffered similar losses on its guaranty.

235.     The FRBNY lost money on ACE 2006-HE3. On December 12, 2008, ML II LLC acquired $24,845,000 principal amount of the Class M-1 Certificates (CUSIP 00441TAF0) and $37,983,000 principal amount of the Class M-2 Certificates (CUSIP 00441TAG8) issued by ACE 2006-HE3. According to the FRBNY, ML II lost

$3,559,088.08 on the Class M-1 Certificates and $971,905.16 on the Class M-2 Certificates issued by ACE 2006-HE3.

### 2.    IMPAIRED VALUE OF CDOS

236.    Each of the Defendants named herein participated in originating certain of the MBS used as collateral for the CDOs.  In addition, certain of the Defendants participated in purchasing RMBS from third parties included in the CDOs and selling the CDOs to purchasers, including to the U.S. Government (using the false documents described herein).  As set forth above, DB Securities, acting with reckless disregard of the truth, omitted material information and made false representations about the quality of the MBS and RMBS included as collateral in the CDOs and failed to disclose to purchasers the lack of underwriting and quality control about the underwriting and acquisition of the mortgage loans underlying the MBS trusts whose securities the CDOs acquired.

237.    As underwriter of the CDOs, DB Securities knew or should have known if it had conducted any due diligence, that the mortgage loans underlying the MBS used as collateral for the CDOs failed to conform to the underwriting standards of the originators, and knew or should have known that the investment grade credit ratings on such MBS were inflated and that such MBS trusts were missing the original mortgage notes and mortgage assignments.

238.    As a result of Defendants' misconduct, the value of the CDOs acquired, insured, guaranteed or otherwise funded by the U.S. Government has been substantially impaired.

### 3.    DAMAGE TO FANNIE MAE AND FREDDIE MAC

239.    Fannie Mae and Freddie Mac (collectively, the "GSEs") each purchased or insured MBS and CDOs and incurred millions of dollars of losses on such securities

based on Defendants' material omissions and misrepresentations, false statements and claims.

240.     In addition, DB and its affiliates sold defective mortgage loans to the GSEs. Such loans were originated using inflated values and were sold to the GSEs based on material misrepresentations by DB as to the underwriting, origination and quality of such mortgage loans.

241.     As a result of Defendants' knowing, deliberate and reckless actions and the losses sustained by Fannie Mae and Freddie Mac from the purchase of the MBS and CDOs (and the defective mortgage loans), on September 6, 2008, the Director of FHFA placed Fannie Mae and Freddie Mac into conservatorships pursuant to the Housing and Economic Recovery Act of 2008 ("HERA"); the U.S. Government has had to pay in excess of $180 billion to Fannie Mae and Freddie Mac.

242.     Defendants' knowing, deliberate and reckless conduct described herein has affected the investors in the GSEs, including numerous federally insured financial institutions (including the Failed Banks, Failed Credit Unions and the Failed Pension Plans) who incurred stock losses and unpaid dividends resulting from the conservatorship of the GSEs. The placement of Fannie Mae and Freddie Mac into conservatorship wiped out virtually all of the value of the outstanding preferred stock in the two companies.

### 4.     DAMAGES TO THE FAILED CREDIT UNIONS, THE FAILED BANKS, THE FAILED PENSION PLANS

243.     One or more of the Failed Banks, Failed Credit Unions and Failed Pension Plans purchased MBS and/or CDOs and incurred millions of dollars of losses on such securities based on Defendants' material omissions and misrepresentations, false statements and claims. As a result of Defendants' knowing, deliberate and reckless actions and the

losses sustained by such entities from the purchase of the MBS and CDOs, such entities failed and the U.S. Government has had to pay millions of dollars in connection with the failure of such entities.

244.     In addition, DB and its affiliates sold defective mortgage loans to IndyMac. Such loans were originated using inflated values and were sold to IndyMac based on material misrepresentations by DB as to the underwriting, origination and quality of such mortgage loans. As a result of Defendants' knowing, deliberate and reckless actions and the losses sustained by IndyMac from the purchase of the defective mortgage loans, IndyMac failed and the U.S. Government has had to pay millions of dollars in connection with such failure.

### 5.     DAMAGES FROM AIG BAILOUT

245.     AIG purchased or insured billions of dollars of MBS and CDOs and incurred billions of dollars of losses on such securities based on Defendants' material omissions and misrepresentations, false statements and claims. AIG entered into credit default swaps with DB in which DB obtained insurance from AIG on billions of of dollars of CDOs based on Defendants' material omissions and misrepresentations, false statements and claims with respect to such CDOs. Under the Maiden Lane III transaction, DB was paid $2.8 billion for the insured CDOs and DB was allowed to retain the $2.6 billion of cash collateral previously posted by AIG in exchange for terminating the credit default swaps ($5.4 billion total).

246.     Also, AIG entered into securities lending arrangements with DB where AIG obtained cash from DB and AIG purchased DB MBS based on Defendants' material omissions and misrepresentations, false statements and claims. DB was paid $6.4 billion

from Treasury funds used to bail out AIG and to repay AIG's securities lending counterparties.

247.    As a result of Defendants' knowing, deliberate and reckless actions and the losses sustained by AIG, on September 16, 2008, the Federal Reserve provided AIG with an $85 billion credit line.  In addition, on October 3, 2008, AIG received a $37.8 billion bailout from the Treasury under the Troubled Asset Relief Program (TARP).  On November 25, 2008, AIG received an additional $40 billion under TARP and on March 2, 2009, AIG received an additional commitment of $29.8 billion under TARP, in each case as a result of Defendants' misconduct described herein.  Because the Government had billions invested in AIG through various government programs, the Government suffered losses (or forgone profits) on these investments due to the damage caused to AIG by Defendants' misconduct described herein.

### CLAIMS FOR RELIEF

**A.**    **For  Damages  And  Penalties  Under  The  False  Claims  Act
(31 U.S.C. § 3729(a)(1) (2006), and, as amended, 31 U.S.C. § 3729(a)(1)(A))**

248.    Relator incorporates by reference the allegations in each of the preceding paragraphs as if fully set forth in this paragraph.

249.    As set forth above, Defendants knowingly, or acting with deliberate ignorance and/or with reckless disregard of the truth, omitted to disclose material information and made false representations about the quality of the mortgage loans included in the MBS at the time of their sale to the trustee for the benefit of the certificateholders of the related MBS trust and omitted to correct these material omissions and false representations thereafter.

250.    As set forth above, Defendants knowingly, or acting with deliberate ignorance and/or with reckless disregard of the truth, omitted to disclose material information and made false representations about the quality of the MBS and RMBS securing the CDOs and the mortgage loans securing such MBS at the time of sale to the related CDO and omitted to correct these material omissions and false representations thereafter.

251.    As set forth above, Defendants knowingly, or acting in deliberate ignorance or in reckless disregard for the truth, presented and/or caused to be presented, a false or fraudulent claim for payment or approval in connection with the sale of the mortgage loans to the MBS, the sale of the MBS and other RMBS to the CDOs and the sale of the MBS and the CDOs to the Government Purchasers.

252.    As set forth above, Defendants knowingly, or acting with deliberate ignorance and/or with reckless disregard of the truth, sold defective mortgage loans directly to the GSEs and the other Government Purchasers.  Such loans were originated using inflated values and were sold to the Government Purchasers based on material misrepresentations by DB as to the underwriting, origination and quality of such mortgage loans.  As set forth above, Defendants knowingly, or acting in deliberate ignorance or in reckless disregard for the truth, presented and/or caused to be presented, a false or fraudulent claim for payment or approval in connection with the sale of the mortgage loans to the Government Purchasers.

253.    Defendants' misrepresentations and omissions were capable of influencing, and thus were material to, the Government Purchasers' decisions about purchasing, financing, insuring or guaranteeing, directly or indirectly, the MBS and the CDOs and the Government Purchasers' decisions about purchasing the mortgage loans.

254.    The U.S. Government has purchased or financed, insured or guaranteed, directly or indirectly, the purchase of the MBS, the CDOs and the mortgage loans through many Government Purchasers, including, without limitation, through purchases by the Failed Credit Unions, the Failed Banks, the Failed Pension Plans, the FRBNY, PPIFs, the Maiden Lane Entities, the Federal Home Loan Banks, AIG, U.S. Treasury, and Fannie Mae and Freddie Mac. Each such purchaser is "a contractor, grantee, or other recipient" within the meaning of 31 U.S.C. § 3729(b)(2). In addition, the U.S. Government funds used to bail out the Failed Credit Unions, the Failed Banks, the Failed Pension Plans, AIG and Fannie Mae and Freddie Mac, and to finance the PPIFs and the Maiden Lane Entities, were used to "advance a Government program or interest," within the meaning of 31 U.S.C. § 3729(b)(2). The U.S. Government "reimbursed" such purchasers of the MBS and CDOs for damages they suffered from the false and fraudulent claims for payment made by Defendants. The U.S Government has incurred losses as a direct result of the Defendants' misrepresentations and omissions

255.    By virtue of the acts described above, and in violation of 31 U.S.C. §3729(a)(l)(A), for each of the mortgage loans sold to the MBS that failed to conform to the disclosures in the Registration Statements or failed to conform to the representations and warranties made by the Defendants in the pooling and servicing agreements, mortgage loan purchase agreements, or similar documents such as trust agreements, Defendants knowingly, or acting in deliberate ignorance and/or with reckless disregard of the truth, presented and/or caused to be presented a fraudulent claim for payment or approval.

256.     By virtue of the acts described above, and in violation of 31 U.S.C. §3729(a)(l)(A), for each of the mortgage loans sold to the Government Purchasers that failed to conform to the representations and warranties made to the Government Purchasers, including those set forth in the Fannie Guide and Freddie Guide, Defendants knowingly, or acting in deliberate ignorance and/or with reckless disregard of the truth, presented and/or caused to be presented a fraudulent claim for payment or approval.

257.     Pursuant to the False Claims Act, 31 U.S.C. § 3729(a)(l), Defendants are liable to the United States under the treble damage and civil penalty provisions for a civil penalty of not less than $5,500 and not more than $11,000 for each of the false or fraudulent claim herein, plus three (3) times the amount of damages which the U.S. Government has sustained because of Defendants' actions.

B.     **FOR DAMAGES AND PENALTIES UNDER THE FALSE CLAIMS ACT U.S.C. § 3729(a)(2)(2006), and, as amended, 31 U.S.C. § 3729(a)(1)(B)**

258.     Relator incorporates by reference the allegations in each of the preceding paragraphs as if fully set forth in this paragraph.

259.     As set forth above, Defendants' knowingly, or acting in deliberate ignorance or in reckless disregard for the truth, made, used, or caused to be made or used, false records and/or statements material to false or fraudulent claims in connection with the sale of the mortgaged loans to the trustee on behalf of the Certificateholders of the MBS, the sale of the RMBS and other mortgage collateral to the CDOs and the sale of the MBS and the CDOs to the Government Purchasers.

260.     As set forth above, Defendants knowingly, or acting in deliberate ignorance or in reckless disregard for the truth, made, used, or caused to be made or used, false records

and/or statements material to false or fraudulent claims in connection with the sale of the mortgaged loans to the Government Purchasers.

261.     Defendants' misrepresentations and omissions were capable of influencing, and thus were material to, the Government Purchasers' decisions about purchasing, financing, insuring or guaranteeing, directly or indirectly, the MBS, the CDOs and the mortgage loans.

262.     U.S. Government funds have been used to purchase the MBS, the CDOs and the mortgage loans and to reimburse the losses incurred by the Government Purchasers from their purchases of the MBS, the CDOs and the mortgage loans.  The U.S Government has incurred losses as a direct result of the Defendants' misrepresentations and omissions.

263.     By virtue of the acts described above, and in violation of 31 U.S.C. §3729(a)(1)(B), for each of the mortgage loans sold to the MBS that failed to conform to the disclosures in the Registration Statements or failed to conform to the representations and warranties in the pooling and servicing agreements, mortgage loan purchase agreements or similar documents such as trust agreements, Defendants knowingly, or acting in deliberate ignorance and/or with reckless disregard of the truth, made, used, or caused to be made or used, false records and/or statements material to false or fraudulent claims.

264.     By virtue of the acts described above, and in violation of 31 U.S.C. §3729(a)(l)(B), for each of the mortgage loans sold to the Government Purchasers that failed to conform to the representations and warranties made to the Government Purchasers, including those set forth in the Fannie Guide and Freddie Guide, Defendants knowingly, or acting in deliberate ignorance and/or with reckless disregard of the truth,

made, used, or caused to be made or used, false records and/or statements material to false or fraudulent claims.

265.　　　Pursuant to the False Claims Act, 31 U.S.C. § 3729(a)(1), Defendants are liable to the United States under the treble damage and civil penalty provisions for a civil penalty of not less than $5,500 and not more than $11,000 for each of the false or fraudulent claims herein, plus three (3) times the amount of damages which the U.S. Government has sustained because of Defendants' actions.

### C.　FOR DAMAGES AND PENALTIES UNDER THE FALSE CLAIMS ACT (31 U.S.C. § 3729(a)(7)(2006), and, as amended, 31 U.S.C. § 3729(a)(1)(G))

266.　　　Relator incorporates by reference the allegations in each of the preceding paragraphs as if fully set forth in this paragraph.

267.　　　As set forth above, Defendants knowingly, or acting in deliberate ignorance or in reckless disregard for the truth, concealed or improperly avoided or decreased their obligations to repurchase defective mortgage loans from the MBS trusts in accordance with their obligations as disclosed in the Registration Statements and/or under the pooling and servicing agreements, mortgage loan purchase agreements or similar documents such as trust agreements.

268.　　　As set forth above, Defendants knowingly, or acting in deliberate ignorance or in reckless disregard for the truth, concealed or improperly avoided or decreased its obligation to repurchase defective mortgage loans from Fannie Mae and Freddie Mac in accordance with their obligations under the Fannie Guide and Freddie Guide, respectively, and/or applicable purchase contracts.

269.　　　By virtue of the acts described above, and in violation of 31 U.S.C. §3729(a)(1)(G), for each of the mortgage loans sold to the MBS that failed to conform to

the representations and warranties in the pooling and servicing agreements, mortgage loan purchase agreements or similar documents such as trust agreements, Defendants knowingly, or acting in deliberate ignorance and/or with reckless disregard of the truth, concealed or improperly avoided or decreased its obligation to repurchase defective mortgage loans from the MBS trusts.

270.    By virtue of the acts described above, and in violation of 31 U.S.C. §3729(a)(l)(G), for each of the mortgage loans sold to the Government Purchasers that failed to conform to the representations and warranties made to the Government Purchasers, including those set forth in the Fannie Guide and Freddie Guide, Defendants knowingly, or acting in deliberate ignorance and/or with reckless disregard of the truth, concealed or improperly avoided or decreased its obligation to repurchase defective mortgage loans from the Government Purchasers.

271.    Pursuant to the False Claims Act, 31 U.S.C. § 3729(a)(1), Defendants are liable to the United States under the treble damage and civil penalty provisions for a civil penalty of not less than $5,500 and not more than $11,000 for each mortgage loan it improperly failed to repurchase, plus three (3) times the amount of damages which the U.S. Government has sustained because of Defendants' actions.

**PRAYER FOR RELIEF**

272.    WHEREFORE, the Relator respectfully request that judgment be entered in its favor and against Defendants as follows:

(a)    On Counts One, Two and Three (False Claims Act), a judgment against all Defendants for treble damages and civil penalties for the maximum amount allowed by law;

98

(b)     For an award of costs pursuant to 31 U.S.C. § 3729(a) and 31 U.S.C. § 3730(d); and

(c)     For such further relief that the Court deems just.

## DEMAND FOR TRIAL BY JURY

The Relator respectfully demands a trial by jury for all issues so triable as a matter of right.

RESPECTFULLY SUBMITTED this **7** day of December, 2015.


By: _Francis P. Karam_

Francis P. Karam
Law Office of Francis P. Karam
175 Varick Street, #345
New York, NY 10014
Phone: (212) 489-3900
E-Mail: frank@fkaramlaw.com


*Counsel for Relator*

**Annex A**

<u>MBS</u>

<u>This list is deemed to include (i) any MBS trusts sponsored, underwritten or sold by DB and (ii) any third-party MBS for which MortgageIT or DBHL acted as originator and which included a description of MorgageIT or DBHL and its underwriting standards in the related prospectus supplement for such third-party MBS, that are not listed here.</u>

| |
|---|
| DMSI 2003-1 |
| DBALT 2003-1 |
| DBALT 2003-2 |
| DBALT 2003-3 |
| DBALT 2003-1XS |
| DBALT 2003-2XS |
| DBALT 2003-3XS |
| DBALT 2003-4XS |
| DMSI 2004-1 |
| DMSI 2004-2 |
| DMSI 2004-3 |
| DMSI 2004-4 |
| DMSI 2004-5 |
| |

| |
|---|
| DBALT 2005-1 |
| DBALT 2005-2 |
| DBALT 2005-3 |
| DBALT 2005-4 |
| DBALT 2005-5 |
| DBALT 2005-6 |
| DBALT 2005-AR1 |
| DBALT 2005-AR2 |
| |
| DMSI 2006-PR1 |
| DBALT 2006-AB1 |
| DBALT 2006-AB2 |
| DBALT 2006-AB3 |
| DBALT 2006-AB4 |
| DBALT 2006-AF1 |
| DBALT 2006-AR1 |
| DBALT 2006-AR2 |
| DBALT 2006-AR3 |
| DBALT 2006-AR4 |
| DBALT 2006-AR5 |
| DBALT 2006-AR6 |
| DBALT 2006-OA1 |
| DBALT 2007-1 |
| DBALT 2007-2 |
| DBALT 2007-3 |
| DBALT 2007-4 |
| DBALT 2007-AB1 |
| DBALT 2007-AR1 |

| |
|---|
| DBALT 2007-AR2 |
| DBALT 2007-AR3 |
| DBALT 2007-BAR1 |
| DBALT 2007-OA1 |
| DBALT 2007-OA2 |
| DBALT 2007-OA3 |
| DBALT 2007-OA4 |
| DBALT 2007-OA5 |
| DBALT 2007-RAMP1 |

| |
|---|
| ACE 2003-FM1 |
| ACE 2003-HE1 |
| ACE 2002-HE3 |
| ACE 2003-HS1 |
| ACE 2003-NC1 |
| ACE 2003-OP1 |
| ACE 2003-TC1 |
| ACE 2004-FM1 |
| ACE 2004-FM2 |
| ACE 2004-HE1 |
| ACE 2004-HE2 |
| ACE 2004-HE3 |
| ACE 2004-HE4 |
| ACE 2004-HS1 |
| ACE 2004-IN1 |
| ACE 2004-OP1 |
| ACE 2004-RM1 |
| ACE 2004-RM2 |

| |
|---|
| ACE 2004-SD1 |
| ACE 2005-ASP1 |
| ACE 2005-AG1 |
| ACE 2005-HE1 |
| ACE 2005-HE2 |
| ACE 2005-HE3 |
| ACE 2005-HE4 |
| ACE 2005-HE5 |
| ACE 2005-HE6 |
| ACE 2005-HE7 |
| ACE 2005-RM1 |
| ACE 2005-RM2 |
| ACE 2005-SD1 |
| ACE 2005-SD2 |
| ACE 2005-SD3 |
| ACE 2005-SL1 |
| ACE 2005-SN1 |
| ACE 2005-WF1 |
| ACE 2006-ASP1 |
| ACE 2006-ASP2 |
| ACE 2006-ASP3 |
| ACE 2006-ASP4 |
| ACE 2006-ASP5 |
| ACE 2006-ASP6 |
| ACE 2006-ASL1 |
| ACE 2006-CW1 |
| ACE 2006-FM1 |
| ACE 2006-FM2 |

| |
|---|
| ACE 2006-GP1 |
| ACE 2006-HE1 |
| ACE 2006-HE2 |
| ACE 2006-HE3 |
| ACE 2006-HE4 |
| ACE 2006-NC1 |
| ACE 2006-NC2 |
| ACE 2006-NC3 |
| ACE 2006-OP1 |
| ACE 2006-OP2 |
| ACE 2006-SD1 |
| ACE 2006-SD2 |
| ACE 2006-SD3 |
| ACE 2006-SL1 |
| ACE 2006-SL2 |
| ACE 2006-SL3 |
| ACE 2006-SL4 |
| ACE 2007-ASP1 |
| ACE 2007-D1 |
| ACE 2007-ASL1 |
| ACE 2007-ASP2 |
| ACE 2007-HE1 |
| ACE 2007-HE2 |
| ACE 2007-HE3 |
| ACE 2007-HE4 |
| ACE 2007-HE5 |
| ACE 2007-SL1 |
| ACE 2007-SL2 |

| |
|---|
| ACE 2007-SL3 |
| ACE 2007-WM1 |
| ACE 2007-WM2 |
| PHH 2007-1 |
| PHH 2007-2 |
| PHH 2007-3 |
| PHH 2008-CIM1 |
| MHL 2007-1 |
| MHL 2007-2 |

**Annex B**

CDOs

Blue Edge ABS CDO Ltd.
Dalton CDO Ltd.
Gemstone CDO IV Ltd.
Gemstone CDO V Ltd.
Gemstone CDO VII Ltd
Halcyon Securitized Products Investors ABS CDO II Ltd
Hamilton Gardens CDO II LTD.
Pine Mountain CDO II Ltd.
Sharps CDO II Ltd.
Tourmaline CDO III Ltd.

This list is deemed to include any CDOs sponsored, underwritten or sold by DB that are not listed here

## Annex C

### Failed Credit Unions

2014
Life Line Credit Union Inc.
Health One Credit Union
Mayfair Federal Credit Union
Parsons Pittsburg Credit Union
St. Francis Campus Credit Union

2013
Bagumbayan Credit Union
Polish Combatants Credit Union
Mayfair Federal Credit Union,
Craftsman Credit Union,
Greater Oregon Federal Credit Union
Taupa Lithuanian Credit Union
PEF Federal Credit Union
Zane Trace Federal Credit Union,
Ochsner Clinic Federal Credit Union
First Kingdom Community Credit Union
Electrical Workers #527 Federal Credit Union
Lynrocten Federal Credit Union
Shiloh of Alexandria Federal Credit Union
I.C.E. Credit Union
Pepsi Cola Federal Credit Union
Amez United Credit Union
NCP Community Development Federal Credit Union
New Covenant Missionary Baptist Church Credit Union

2012
Border Lodge Credit Union
G.I.C. Federal Credit Union
Olean Federal Credit Union
Chetco Federal Credit Union
Women's Southwest Federal Credit Union
El Paso Federal Credit Union
United Catholic Credit Union
Eastern New York Federal Credit Union
People for People Community Development Credit Union

Saguache County Credit Union

Shepherd's Federal Credit Union

Wausau Postal Employees Credit Union

Telesis Community Credit Union

A M Community Credit Union

2011

Oakland Municipal Credit Union

Family First Federal Credit Union

NYC OTB Federal Credit Union

Wisconsin Heights Credit Union

Land of Enchantment Federal Credit Union

Mission San Francisco Federal Credit Union

Utah Central Federal Credit Union

Hmong American Federal Credit Union

Valued Members Federal Credit Union

St. James A.M.E. Federal Credit Union

Borinquen Federal Credit Union

Vensure Federal Credit Union

2010

Kern Central Credit Union  California
Friendship Community Federal Credit Union  Mississippi
Mutual Diversified Employees Federal Credit Union  California
Lawrence County School Employees Federal Credit Union  PA
South End Mutual Benefit Association, Inc.  Connecticut
Tracy Federal Credit Union  California
St. Paul's Croatian Federal Credit Union  Ohio
Convent Federal Credit Union  New York
Orange County Employees Credit Union  Texas
Southwest Community Federal Credit Union  Utah
Norbel Credit Union  Utah
Certified Federal Credit Union  California
Kappa Alpha Psi  Texas
First American Credit Union  Wisconsin
Industries Puerto Rico Federal Credit Union  Puerto Rico
Phil-Pet Federal Credit Union  Texas
The Union Credit Union  Washington
Constitution Corporate Federal Credit Union  Connecticut

Beehive Credit Union

2009

Heritage West Federal Credit Union
Fairfield County Ohio Federal Employees Credit Union
Ensign Federal Credit Union
Second Baptist Church Credit Union
West Texas Credit Union
Members Own Credit Union
Clearstar Federal Credit Union
Comunidades Federal Credit Union
Kaiser Lakeside Credit Union
Free Choice Federal Credit Union
Community One Credit Union
Watts United Credit Union
High Desert FCU
Rouge Employees Credit Union
Center Valley Federal Credit Union

2008

West Hartford CU
N&W Poca Division FCU
Texdot WF Credit Union
Kaiperm FCU
Interfaith FCU
Port Trust FCU
New London Security FCU
Meriden F.A. FCU
Cal State 9 Credit Union
Sterlent Credit Union
Father Burk FCU
St. Luke Babtist FCU
Norlarco Credit Union
Valley Credit Union
High Desert FCU

2007

Homeowners Association Credit Union
Huron River Area CU
Green Tree CU
New Horizons Community Credit Union:
Cambria CU
Sharebuilders CU
State & Parish Employees FCU