**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------

UNITED STATES OF AMERICA, ex rel.
JOSEPH AMICO

               Plaintiff/Relator,

     against

DEUTSCHE BANK AG; DB STRUCTURED
PRODUCTS, INC.; DEUTSCHE BANK
SECURITIES INC.; DB HOME LENDING LLC;
DB HOME LENDING HOLDINGS LLC;
MORTGAGEIT, INC.; DEUTSCHE ALT-A
SECURITIES, INC.; ALTAMONT HOLDINGS
CORP.; MORTGAGEIT SECURITIES CORP.; ACE
SECURITIES CORP.; DEUTSCHE BANK
NATIONAL TRUST COMPANY;

               Defendants.

--------------------------------------------------------------------

                15 CV 9551(CM)

 

MEMORANDUM OF LAW IN SUPPORT OF JOSEPH AMICO'S MOTION
TO BE AWARDED HIS STATUTORY SHARE OF THE
PROCEEDS OF THE GOVERNMENT'S SETTLEMENT WITH DEFENDANTS

## TABLE OF CONTENTS

STATEMENT OF FACTS ............................................................................................... 1

Mr. Amico's Information ............................................................................................. 7

The Complaint ........................................................................................................... 9

The Allegations in the Complaint were based upon Mr. Amico's Information ........................... 11

Procedural History ................................................................................................... 12

The Settlement ........................................................................................................ 13

ARGUMENT ........................................................................................................... 13

I.     THE APPLICABLE STATUTORY FRAMEWORK .......................................... 13

A.     THE FCA AND THE "QUI TAM" PROVISIONS ...................................... 13

B.     THE "ALTERNATIVE REMEDY" PROVISION ..................................... 14

C.     THE PUBLIC DISCLOSURE BAR .................................................... 17

D.     ORIGINAL SOURCE ...................................................................... 18

II.    ANALYSIS ...................................................................................... 21

A.     THE SETTLEMENT OVERLAPS WITH THE COMPLAINT ....................... 21

B.     ONE OR MORE ALLEGATIONS/CLAIMS IN THE COMPLAINT ARE NOT BARRED BY THE PUBLIC DISCLOSURE BAR .................................. 22

C.     MR. AMICO IS THE "ORIGINAL SOURCE" OF THE INFORMATION .......... 22

III.   FRCP RULE 59 OR 60 IS THE PROPER BASIS FOR SEEKING RELIEF UNDER FCA § 3730(c)(5) ...................................................................... 28

PRAYER FOR RELIEF ............................................................................. 28

DEMAND FOR TRIAL BY JURY ................................................................ 29

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Hughes Aircraft Co. vs. United States ex rel Schumer*, 520 U.S. 939, 946 (1997) ..................... 17

*Kirk v. Schindler Elevator Corp.*, Summary Order (2nd Cir. 2011).............................................. 18

*Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 467–68 (2007)........................................... 18

*U.S. ex rel. Bledsoe v. Community Health Systems, Inc*., 342 F.3d 634, 649 (6th Cir. 2003)...... 15

*U.S. ex rel. Branch Consultants, LLC v. Allstate Ins. Co.*, 668 F. Supp. 2d 780, 797 (E.D. La. 2009) ........................................................................................................................................... 20

*U.S. ex rel. Laird v. Lockheed Martin Eng'g & Sci. Servs. Co.*, 336 F.3d 346, 355 (5th Cir. 2003) ................................................................................................................................................... 19

*U.S. ex rel. Minn. Ass'n of Nurse Anesthetists v. Allina Health Sys. Corp.*, 276 F.3d 1032, 1048 (8th Cir. 2002)................................................................................................................... 19, 20

U.S. ex rel. *Smart v. Christus Health*, No. 2:05-cv-287, 2013 WL 2289883 (S.D. Tex. May 22, 2013), <u>aff'd sub nom.</u> *U.S. ex rel Smart v. Health*, 563 F. App'x 314 (5th Cir. 2014) ....... 16, 28

*U.S. ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Provident Life & Accident Ins. Co.* ("Provident"), 721 F. Supp. 1247, 1257-58 (S.D. Fla. 1989) ...................................................... 20

*United States ex rel. Barajas v. United States,* 258 F.3d 1004, 1012 (9th Cir. 2001) ................. 16

*United States ex rel. Bledsoe v. Community Health Sys.*, 501 F.3d 493, 522-23 (6th Cir. 2007). 16

*United States ex rel. Devlin v. California*, 84 F.3d 358, 362 (9th Cir. 1996)............................... 19

*United States ex rel. Doe v. John Doe Corp.*, 960 F.2d 318, 324 (2nd Cir. 1992) ....................... 17

*United States ex rel. Findley v. FPC-Boron Employees' Club*, 105 F.3d 675, 690 (D.C. Cir. 1997) ............................................................................................................................................ 20

*United States ex rel. Grayson v. Advanced Mgmt. Tech., Inc.*, 221 F.3d 580, 583 (4th Cir. 2000) ................................................................................................................................................... 19

*United States ex rel. Kinney v. Stoltz*, 327 F.3d 671, 674 (8th Cir. 2003) ................................... 19

*United States ex rel. Kreindler & Kreindler v. United Tech. Corp.*, 985 F.2d 1148, 1159 (2nd Cir. 1993) .......................................................................................................................................... 18

*United States ex rel. LaCorte v. Wagner*, 185 F.3d 188, 191 (4th Cir. 1999) ....................... 15, 28

United States ex rel. Merena v. SmithKline Beecham Corp., 205 F. 3d 97, 102 (CA3 2000)..... 18

*United States ex rel. Reagan v. E. Tex. Med. Ctr. Reg'l Healthcare Sys.*, 384 F.3d 168, 177 (5th Cir. 2004) ................................................................................................................................. 20, 21

**Statutes**

31 U.S.C. § 3730(c)(5).................................................................................................................... 15

31 U.S.C. § 3730(e)(4).................................................................................................................... 17

31 U.S.C. §§3729(a)(1)(A)-(B) ..................................................................................................... 14

## STATEMENT OF FACTS

On or about January 10, 2013, Pierre Armand, the Deputy Chief of the Civil Frauds Unit of the U.S. Attorney's Office of the Southern District of New York, called Relator Joseph Amico to invite him to a meeting in its New York offices.  He asked for the meeting after the U.S. Department of Justice ("DOJ") reviewed a sample of proprietary information that Mr. Amico had provided to the DOJ on January 8, 2013 on certain borrowers and properties securing the mortgages contained in a Residential Mortgage Backed Securities ("RMBS") trust.  Amico Dec. ¶ 10.[1]

At their meeting on February 1, 2013, Mr. Armand stated that the Government had never seen evidence as convincing as the information that Mr. Amico had shown him, that the information was extremely valuable and that the Government "had nothing on the banks."  He asked, on behalf of the Government, that Mr. Amico act as a whistleblower against ten (10) foreign and domestic investment banks, including Defendant Deutsche Bank, and provide the Government with information and evidence of fraudulent conduct by such banks in creating, marketing and selling RMBS.  Amico Dec. ¶¶ 10-11.

Mr. Amico replied that he didn't really want to be a whistle blower and spend thousands of hours of work creating information for the DOJ only to find out the DOJ already had an investigation going and be shut out of a whistleblower award.  Mr. Armand told Mr. Amico that his office at the DOJ (which includes the RMBS Working Group) had no investigations into the RMBS practices of these ten banks (the "Foreign Banks") and that nobody else had come forward as a whistleblower on these banks.  Mr. Armand stated that the Government needed Mr.

---

[1]     The Accompanying Declaration of Joseph Amico, dated February 14, 2017, is cited herein as "Amico Dec."

Amico to be a whistleblower to "trigger" investigations by the DOJ of the banks.  Amico Dec. ¶¶ 11-12.  Mr. Armand was a lead prosecutor for cases investigated and brought as part of the Residential Mortgage-Backed Securities (RMBS) Working Group of the DOJ's Financial Fraud Enforcement Task Force.

Because of Mr. Amico's concerns, Mr. Armand said he would double check whether the DOJ was investigating these banks (including Deutsche Bank) in any other DOJ offices and get back to him.  Amico Dec. ¶ 12.  Mr. Amico said that he would consider DOJ's request for him to be a whistleblower if he was assured there was no current investigations and he was eligible for a whistleblower award.

Mr. Armand called Mr. Amico a week or so after the meeting and said he had checked the DOJ's systems and consulted his superiors in Washington, DC and said he was certain that the DOJ had no investigations going on Deutsche Bank or the other banks.  Mr. Armand asked Mr. Amico to submit a declaration (so that DOJ could open investigations into the 10 banks) and that the DOJ wanted Mr. Amico to provide to the DOJ more of the same type of information on the borrowers and properties backing the mortgages in the RMBS trusts that he had provided in the sample and had shown to Mr. Armand at their initial meeting.  Amico Dec. ¶ 13.

After careful deliberation, taking into account Mr. Armand's assurances that there was no investigations and that he would be eligible for a whistleblower award, Mr. Amico decided to step-up as the whistleblower for several reasons, including, but not limited to: (1) the lack of any alternative whistleblower available to the Government; (2) the fact the Government would be required to pay him a percentage of any recovery; and (3) Mr. Armand's assurance he would be treated fairly by the Government.  Amico Dec. ¶ 13.  In addition, his decision was reinforced by his belief that it was the right thing to assist our Government in obtaining compensation for the

severe damage these banks' had caused to our Government and our country.

Thereafter, at Mr. Armand's direction, Mr. Amico began to file whistleblower documents with Michael Granston, Director Commercial Litigation Branch, Fraud Section, of the U.S. Attorney General's Office at the Department of Justice in Washington DC and with Mr. Armand at his Manhattan office.  On March 6, 2013, Mr. Amico e-mailed to Mr. Armand a draft of his declaration seeking comments from Mr. Armand.[2]  On March 15, 2013, Mr. Amico e-mailed to Mr. Armand the Exhibits to the draft declaration which comprised about 300 pages.  Mayers Decl., Exhibit A, p. 25.

On March 25, 2013, Mr. Amico submitted his formal declaration against the banks, including Deutsche Bank (the "Declaration") to Micheal Granston and Mr. Armand.[3]  Included with the Declaration were hundreds of pages of extensive evidentiary exhibits providing information on the borrowers/properties relating to the mortgages contained in the several banks' RMBS.  In his cover letter, Mr. Amico stated that the information "is the product of collaboration with Pierre Armand of the USAG/SDNY office."  Shortly after Mr. Amico filed his Declaration, the DOJ began issuing press statements saying they had commenced investigations into the Foreign Banks.

On March 29, 2013, Michael Schulman of the US Attorney's office in Washington, DC, who was involved in the task force investigating the Foreign Banks, called Mr. Amico indicating

---

[2]     A true and accurate copy of the e-mail exchanges between Mr. Amico and Mr. Armand, and Mr Amico and assistant U.S. attorney Li Yu are annexed to the the accompanying Declaration of Matthew Mayers, dated February 14, 2017 (the "Mayers Decl.") as **Exhibit A**.  The March 6, 2013 e-mail can be found on p. 28 of Exhibit A.

[3]     A true and accurate copy of the Declaration including the cover letter is annexed to the Mayers Decl. as **Exhibit B**.  The Declaration was submitted as a declaration under the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), and as information to satisfy the statutory requirements for a FCA action by Mr. Amico.

that he had a copy of Mr. Amico's Declaration.  Mr. Schulman told Mr. Amico that the information he provided was very helpful and that he wanted to "hire" Mr. Amico to provide more information on these banks, but explained he was limited in his options since Mr. Amico was the whistleblower and would be entitled to a percentage of any recovery.  They agreed that if Mr. Schulman thought of a way to "hire" Mr. Amico, Mr. Schulman would contact him.  Amico Dec. ¶ 14.

On April 8, 2013, Mr. Armand e-mailed Mr. Amico stating that "I have your FIRREA declaration and am assigning a line assistant to work the case.  Will have someone contact you when we are up and running." Mayers Decl., Exhibit A, p. 29.  On May 13, 2013, Mr. Armand e-mailed Mr. Amico asking him to call assistant U.S. attorney Li Yu to set up a meeting to review the information set forth in the Declaration.  Mayers Decl., Exhibit A, p. 31.

On June 3, 2013, Mr. Amico and Mr. Yu met at DOJ's New York offices where Mr. Amico walked Mr.Yu through how he produced the information on the borrowers and properties underlying the mortgages that were included in the Declaration.  He explained to Mr. Yu how he first learned of the low underwriting standards in the mortgage and mortgage security businesses in 2002 when he was an investment banker at Citigroup.  In the course of resolving a Citibank tax issue involving residual (equity) interests of RMBS, he explained to Mr. Yu he did a complete analysis of the RMBS business, Citigroup's competitors (including UBS, Deutsche Bank, CSFB, Greenwich Capital (RBS), GE Capital, Wells Fargo and others) and industry trends.  Through such work, Mr. Amico learned that the mortgage borrowers' creditworthiness and the collateral properties' values were secondary and tertiary considerations to RMBS originators.  During this timeframe, he learned of the failure by these same RMBS sponsors to transfer mortgage loans to RMBS trusts, the fledging use of MERS (mortgage electronic

4

registration system), and how mortgage transfers occurred "off the radar" of the county clerks (since no mortgage loan assignments were recorded.) Amico Dec. ¶ 18.

At the meeting, Mr. Yu asked whether any of the information Mr. Amico provided was somehow confidential information subject to attorney-client privilege. Mr. Amico made clear to Mr. Yu that any and all information he provided (or would provide in the future) was the result of his own individual efforts and experience, and not obtained as the result of any attorney-client privilege or from any other source. Mr. Amico explained he had previously provided information to private plaintiffs about the failure to transfer mortgages into RMBS trusts (for a contract rescission claim). He clarified that he had only provided information about the failure to transfer the mortgages into the RMBS trusts and, unlike with the Government, he never provided any information about the borrowers or properties (because he was never asked to do so.). Also, Mr. Amico explained that he was the original source of all of the information he produced – he did not get the information from any middleman. Mr. Amico explained to Mr. Yu that, just as with the Government, he generated and provided the information to the various plaintiffs. Mr. Amico demonstrated to Mr. Yu that the information flow was a "one way street"- from Mr. Amico to the plaintiffs. Mr. Amico never received any information from the various plaintiffs or their attorneys about the investment banks (because they had **no** such information). Mr. Yu confirmed that Mr. Amico's system for developing the information against the banks and the information itself was very valuable. Amico Dec. ¶ 18.

During the next couple of months, the DOJ and Mr. Amico had regular communications. For example, on June 27, 2013, in response to a follow up by Mr. Amico, Mr. Yu e-mailed: "Joe, [t]hanks for following up. I will get in touch with you if I need further information. –Li" Mayers Decl., Exhibit A, p. 64. On August 2, 2013, in response to an e-mail by Mr. Amico

inquiring as to what was happening, Mr. Armand replied:   "Joe -- we are investigating.  Nothing to report at the moment. We will keep you posted. Thanks."  Mayers Decl., Exhibit A, p. 74.

On November 12, 2013, Mr. Yu e-mailed Mr. Amico asking to have a follow-up meeting "about the information you provided and your thoughts regarding potentially fruitful avenues of investigation."  Mayers Decl., Exhibit A, p. 41.

On November 25, 2013, Mr. Amico had a second meeting with Mr. Yu and his associate William Smith at DOJ's New York offices.  At that meeting, in response to Mr. Yu's questions, Mr. Amico gave Mr. Yu further leads for investigating the banks.  Mr. Yu asked Mr. Amico whether he would be interested in working on the basis of an hourly fee instead of a contingent fee.  Mr. Amico told Mr. Yu that he'd stick with the contingent fee arrangement.  Amico Dec. ¶ 20.

Later that afternoon, Mr. Amico sent Mr. Yu an e-mail with information regarding topics they discussed at their meeting.  In response, Mr. Yu e-mailed Mr. Amico stating:  "Joe, [t]hank you very much for following up with this information. –Li"  Mayers Decl., Exhibit A, p. 47.

Nearly two years elapsed from the time Mr. Amico met with Mr. Yu and Mr. Amico did not hear back from the DOJ.  Mr. Amico was concerned that the DOJ was not pursuing the case against Deutsche Bank which Mr. Amico felt was a very strong case based on the information he had generated.  On September 8, 2015, Mr. Amico submitted to the Government a 28 page supplement (the "Declaration Supplement") to his March 2013 Declaration which included hundreds of pages of additional evidentiary exhibits about the mortgages contained in the Deutsche Bank RMBS, along with a thumb drive containing thousands of evidentiary

documents.[4]   In the cover letter, Mr. Amico indicated that the written disclosure was also submitted to satisfy the statutory requirements for a False Claims Act complaint.

Mr. Amico's Information

As Mr. Amico explained to Messrs. Armand, Lu, Schuman and others at the DOJ, Mr. Amico generated the information on the borrowers and collateral properties through his own efforts – i.e., he did not get the information from any middleman or from any public disclosures. As described below under "The Complaint", the Defendants perpetrated their fraud by intentionally concealing the names and addresses of the borrowers and the addresses of the collateral properties and went to great lengths to hide such information from investors.  While Mr. Amico obtained Deutsche Bank RMBS loan schedules from private sources, those loan schedules did not list the name of the borrower or address of the collateral property.

Mr. Amico identified the borrower names and collateral property addresses of loans backing the DB RMBS using a method he invented.  Amico Dec. ¶¶ 28 and 29.  Paragraph 14 of the Complaint and paragraph 30 of the Amico Dec. describe Mr. Amico's methodology in Orange County, Florida (Orlando).  He used other customized methods in each of the hundreds of county recording offices throughout the country he accessed.  Using his proprietary methods, he was able to determine the names of the borrowers and addresses of the collateral properties for loans backing the DB RMBS.  However, his methodology only led him to a mortgage document.  However, the mortgage document itself did not demonstrate the fraud.  Subsequent steps were required.  Amico Dec. ¶¶ 30-31.

After he unmasked the borrower name and collateral property address relating to a

---

[4]     A true and accurate copy of the declaration supplement along with the cover letter is annexed to the Mayers Decl. as **Exhibit C**.

specific mortgage loan included in a DB RMBS trust, Mr. Amico unearthed deeds, mortgages and other documents for the borrower and collateral property.  Using such evidence, Mr. Amico created a borrower history and a property history which demonstrated such borrower's credit worthiness (or lack thereof) and the value of the collateral property.  Neither the borrower history nor the property history that Mr. Amico created is a public document or record.  It is Mr. Amico's work product.  Mr. Amico integrated the borrower history and property history into a third distinct product he called a "borrower/property history", also Mr. Amico's private work-product.  Mr. Amico created the Exhibits to the Complaint for a single mortgage loan by synthesizing such information into an easy to read narrative that is comprehensible and designed to meet the legal requirements to show fraud by the Defendants. Lastly, Mr. Amico supplemented the borrower/property history when warranted.  The sources of supplemental information for the Exhibits were private, market and/or public, as the facts warranted. Amico Dec. ¶¶ 32-37.

The Exhibits to the Complaint, along with all of the information and documents from the borrower/property history, constituted the core information on which the allegations in the Complaint were based.  Mr. Amico provided all such information and evidence to the Government with his Declaration Supplement prior to filing the Complaint.  Amico Dec. ¶¶ 38-52.

It cannot be disputed that the borrower/property histories and Exhibits were created by Mr. Amico's own efforts and that such information was not obtained through public disclosures. Furthermore, the proprietary methodology that Mr. Amico used in identifying the borrower names and collateral properties was devised through his own efforts and such methodology was not (and is not) publically available.

8

The Complaint

On December 7, 2015, Mr. Amico filed his *qui tam* Complaint[5] against Deutsche Bank. With the sealed Complaint, he also furnished to the government, a "written disclosure of substantially all material evidence and information [he] possesse[d]." This was supplemental to the information that Mr. Amico had previously submitted to the DOJ with his March 2013 Declaration, and was identical to the information included in the September 8, 2015 Declaration Supplement.

The Complaint explains that the Defendants perpetrated their fraud by "intentionally conceal[ing] the name and address of each individual borrower and the address of the collateral property" . . "so that purchasers, including the United States, could not conduct their own due diligence" of the underlying mortgage loans. Complaint ¶¶ 8 and 10.

The Complaint explains how the fraud worked. "As a matter of practice, Defendants never provided MBS investors with borrower names or collateral property addresses. In fact, Defendants built safeguards into their MBS marketing system to prevent such information from being given to an inquiring investor." Complaint ¶ 22. The Complaint further explains that:

> "the loan schedule was listed as a schedule to the Pooling and Servicing Agreements that Defendants filed as part of the Registration Statements. However, instead of attaching the loan schedule where the loan schedule should have been, the filed Pooling and Servicing Agreements stated "PROVIDED UPON REQUEST." The Pooling and Servicing Agreements gave the impression that someone who asked would be provided with the loan schedule. However, Relator's information (i.e. we called up the Defendants and asked for the information) reveals that a person who requested the loan schedule would be given the runaround to dissuade them from obtaining the loan schedules and, in fact, would not be given the loan schedule by Defendants even after multiple requests." Complaint ¶ 23.

---

[5]       ECF posted the Complaint on 10/7/2016 (ECF7) but didn't post the Exhibits. A true and accurate copy of the Exhibits to the Complaint are annexed to the Mayers Decl. as **Exhibit D**.

Mr. Amico knew that Defendants would not provide a loan schedule with the names and addresses of the borrowers based on his own knowledge that he gained from his direct experience with Defendants.  He called Defendants as a potential investor, requested the names of the borrowers and addresses of the properties and was refused this information after multiple requests.

"Omitting borrower names and collateral property addresses from the loan schedules (which DB did not provided to investors in the first place) prevented MBS investors from discovering the borrowers' inability to repay their loans, the overvaluation of properties securing such loans and the undisclosed concentrations of risk in certain borrowers or certain properties (because an RMBS trust contained multiple loans from the same borrower or loans secured by properties in the same development)."  Complaint ¶ 27.

The Complaint explains how Defendants used MERS as a nominee to conceal the names of borrowers and the addresses of collateral properties:

If the mortgages were recorded in the name of DB and the assignments of the mortgages were delivered and recorded as provided in the registration statements, an investor could search the public records and find the loans originated by DB and assigned to the applicable DB trust. By recording the mortgages in the name of a nominee, DB concealed from investors the loans made by DB and owned by a specific DB MBS trust.  This allowed DB to continue to hide from investors the collateral that was originated by DB and the mortgages included in the DB MBS trusts.  Defendants' use of the nominee allowed them to keep specific information (for example, DB's name and the DB MBS trust that owned the notes) from showing up in the County Clerk indices.  For example, in Kings and Queens Counties in New York, loans made by Deutsche Bank subsidiary, MortgageIT, were routinely recorded as "MERS" loans. This tactic rendered the New York City recorder's indices useless to investors and purchasers for finding loans made to DB RMBS trusts when searching for MortgageIT as a lender.  Complaint ¶ 28.

The Complaint also alleges that, in most cases, Defendants rarely, if ever, delivered the original note or an assignment on a timely basis.  Without such delivery and filing of such document, Defendants' continued to hide ownership of a particular mortgage.  This allegation, like the others in the Complaint, were based upon Mr. Amico's information – Exhibits E, F and

G to the Complaint list hundreds of assignments to various MBS trusts, all occurring later, and in most cases much later, than 90 days after closing.

The Allegations in the Complaint were based upon Mr. Amico's Information

Mr. Amico based the allegations in the Complaint on the information he unearthed on hundreds of borrowers and collateral properties backing the Deutsche Bank RMBS.   For example, Mr. Amico alleges that:

"Defendants' omission of property addresses also concealed from investors that the collateral properties were routinely and grossly overvalued.   Relator's information reveals that dozens of properties were used as collateral for $200,000, $300,000 or $400,000+ loans which properties were, in fact, worth a fraction of the loan amount.   The historic and intrinsic property values compiled by Relator evidence how drastically values were inflated.   After default, the properties detailed in Exhibits A, B, C and D returned to their intrinsic values.   The post-default values are always within range of the pre-inflation values (evidencing that Defendants made loans at hyper-inflated values).   Defendants' purported "appraised" values departed radically from historic intrinsic values - often by a factor of 3 or more."   Complaint ¶ 27.

Because Mr. Amico created a detailed "borrower/property history" with respect to hundreds of mortgages and synthesized such information into the Exhibits, he was able to make specific, non-generalized allegations of fraudulent omissions.   See e.g., Complaint ¶¶ 112-116 and Exhibit A to Complaint, borrower #63, which details the buying binge of Erkan Savluk.

In many instances, Mr. Amico's information revealed other material risks – such as the inclusion of multiple loans from the same borrower in a single Deutsche Bank RMBS transaction or a concentration of loans in a single Deutsche Bank RMBS secured by units in a single condominium complex – risks that the Defendants not only failed to disclose but concealed from investors (by hiding the names of borrowers and addresses of collateral properties).   For example, Mr. Amico's information revealed that Defendant MortgageIT financed 4 buyers who purchased 15 condo units in the Mountain Canyon Condo, a conversion from rentals to condos. Defendants then packaged 6 of the first lien loans into a single Deutsche Bank RMBS, MortgageIT 2007-1.  Amico Dec. ¶¶ 40-44; Complaint ¶¶ 91-102.

Procedural History

On January 8, 2016, Rebecca Martin, Assistant United States Attorney in the Civil Division for the United States Attorney's Office for the Southern District of New York, e-mailed Mr. Amico's former attorney, Frank Karam, stating that she had reviewed the Complaint (which had been served on the Government a month earlier) and asked to speak to Mr. Karam about the Complaint.  On January 12, 2016, Ms. Martin and Mr. Karam spoke by telephone.  During that call, she asked Mr. Karam to withdraw the Complaint and stated that the Government would move to dismiss the Complaint if he did not.

 On January 14, 2016, Mr. Karam e-mailed Ms. Martin, stating among other things that he thought the action against Deutsche Bank had merit and should be pursued.  He suggested that the Government should simply decline to intervene and that Relator would prosecute the action against Defendants.  Messrs. Karam and Amico were ready, willing and able to prosecute the action against Deutsche Bank at that time without any help from the Government. Rather than declining to intervene and permiting Mr. Amico to conduct the action against the Defendants like Mr. Karam proposed, Ms. Martin replied that "the Government will be moving to dismiss."[6]

On January 29, 2016, Mr. Amico and the United States agreed to the dismissal of all of Mr. Amico's claims against the Defendants without prejudice as to Mr. Amico's rights.[7]  Under prevailing law the Government had an unfettered right to dismiss the Complaint (even if Mr. Amico wanted to pursue the case against Defendants using his own resources, which he did).  Rather than fighting an unwinnable (motion to dismiss), Mr. Amico reserved his right in the Stipulation of Dismissal to bring an "Alternative Remedy" proceeding against the Government

---

[6]     A true and accurate copy of the e-mail exchange between Ms. Martin and Mr. Karam is annexed to the Mayers Decl. as **Exhibit E**.

[7]     ECF posted the Stipulation and Order of Voluntary Dismissal on 10/7/2016 (ECF4).

for his share of any proceeds of any action or settlement the Government might obtain against the Defendants.  Mr. Amico would have preferred that the Government declined to intervene so that he could have prosecuted the action against Defendants, but the Government would not allow it.

After the Government's settlement with Deutsche Bank, Mr. Amico's attorney, Matthew Mayers, contacted the DOJ in a good faith effort to settle Mr. Amico's right to a share of the settlement amount.  The Government failed to respond to Mr. Mayers outreach.  Mayers Decl. ¶ 9.

The Settlement

On January 17, 2017, the Government entered into a settlement agreement (the "Settlement Agreement") with Defendants paying $3.1 billion to the U.S. Treasury and agreeing to "in kind" consumer relief of $4.1 billion to settle claims against Deutsche Bank related to its alleged fraudulent practices involving the issuance of RMBS prior to January 1, 2009.[8]  The wrongful conduct settled under the Settlement Agreement overlaps with the wrongful conduct alleged by Mr. Amico in the Complaint.

**ARGUMENT**

**I.     THE APPLICABLE STATUTORY FRAMEWORK**

**A.     The FCA and the "qui tam" provisions**

The FCA imposes civil liability on any person who, *inter alia*, "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," or who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or

---

[8] A true and accurate copy of the Settlement Agreement is annexed to the Mayers Decl. as **Exhibit F**.

fraudulent claim." 31 U.S.C. §§3729(a)(1)(A)-(B).  Persons who violate the FCA are liable for civil penalties and double or treble damages, plus the costs incurred in bringing the FCA action. *Id.*; *see also* §3728(a)(2).

The private individual bringing the qui tam suit, known as a relator, must first serve the complaint upon the government, where the complaint then remains under seal for at least sixty days.  Id. § 3730(b)(2).  During this time period, the government may elect to intervene.  Id. If the government does not intervene in the action, the relator may proceed with the action.  Id. § 3730(b)(4)(B), (c)(3).  If the relator successfully recovers funds for the government in pursuing the qui tam action, he or she is entitled to not less than 25% but not more than 30% of the proceeds recovered.  Id. § 3730(d)(2).

If the government intervenes in the action, the relator is entitled to at least 15% but not more than 25% of any proceeds of the action or settlement.  Id. § 3730(d)(1).

In both cases, the relator "shall also receive an amount for reasonable expenses which the court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs. All such expenses, fees, and costs shall be awarded against the defendant."  Id. § 3730(d)(1) and (2).


**B.      The "Alternative Remedy" Provision**


31 U.S.C. § 3730(c)(5), often referred to as the alternative remedy provision, provides:

 Notwithstanding subsection (b), the Government may elect to pursue its claim through any alternate remedy available to the Government, including any administrative proceeding to determine a civil money penalty.  If any such alternate remedy is pursued in another proceeding, the person initiating the action shall have the same rights in such proceeding as such person would have had if the action had continued under this section. 31 U.S.C. § 3730(c)(5).

If the government pursues an alternate remedy, one of the rights to which the relator is entitled is the right to obtain a share "of the proceeds of the action or settlement of the claim." *United States ex rel. LaCorte v. Wagner*, 185 F.3d 188, 191 (4th Cir. 1999).   31 U.S.C. § 3730(d)(1); see *U.S. ex rel. Bledsoe v. Community Health Systems, Inc*., 342 F.3d 634, 649 (6th Cir. 2003).  In addition, if the alternate remedy is a settlement, the relator has a right to have "the court determine[], after a hearing, [whether] the proposed settlement is fair, adequate, and reasonable under the all the circumstances." 31 U.S.C. § 3730(c)(2)(B); see *United States ex rel. LaCorte v. Wagner*, 185 F.3d 188, 191 (4th Cir. 1999).

In *United States ex rel. Bledsoe v. Community Health Sys.,* 342 F.3d 634, 647 (6th Cir. 2003), the Government declined to intervene in a *qui tam* case but, before that case concluded, the Government reached a settlement with the *qui tam* defendant which purported to exclude the relator's claims from its scope. 342 F.3d at 639.  Because the settlement involved conduct that overlapped with his FCA claims, the relator moved the court to recognize the settlement as an alternate remedy to which he was entitled to a share of the settlement proceeds under FCA § 3730(d)(1). The Sixth Circuit agreed holding that "'alternate remedy' refers to the government's pursuit of any alternative to intervening in a relator's qui tam action . . . . [A] settlement pursued by the government in lieu of intervening in a qui tam action asserting the same FCA claims constitutes an 'alternate remedy' for purposes of 31 U.S.C. §3730(c)(5)." Id. at 647-49.

The Sixth Circuit explained that if the government extinguishing a relator's claims by reaching a separate settlement with the defendant were not considered an "alternate remedy" under 31 U.S.C. § 3730(c)(5),

> then the government could decline to intervene in a qui tam suit, then settle that suit's claims separately and deny the relator his or her share of the settlement proceeds simply because the government had not formally intervened in the qui tam action. Consequently, the government would frequently carry the incentive to decline to intervene in an action and, having been apprised of possible FCA violations by a private citizen, to

independently pursue an investigation of the alleged FCA violator(s). Such a result would not further Congress' legislative intent that the government and private citizens collaborate in battling fraudulent claims, and it would impede, not further, Congress' legislative intent to encourage private citizens to file qui tam suits.
Id. at 649.

In determining whether a settlement constitutes an "alternate remedy" to a relator's *qui tam* action, the critical inquiry is whether "the conduct contemplated…in the…settlement agreement overlaps with the conduct alleged by Relator in bringing his *qui tam* action." *Bledsoe*, 342 F.3d at 651; *see also United States ex rel. Barajas v. United States,* 258 F.3d 1004, 1012 (9th Cir. 2001)(holding settlement agreement arising out of administrative suspension and debarment proceeding "based on conduct that formed the basis of the [relator's *qui tam*] action" to be an "alternate remedy."); *U.S. ex rel. Smart v. Christus Health*, 2013 WL 2289883 (US District Court SD Texas 2013)("In order to recover under the [alternative remedy] provision, the original relator must prove that his *qui tam* allegations overlap with the allegations that led to the recovery he wants to share" citing *Bledsoe*).

Where, as in this case, the Government has pursued a settlement in lieu of intervening in a *qui tam* action asserting the same claims, the settlement constitutes an "alternate remedy" under the FCA and the relator is entitled to a share of the proceeds. *Bledsoe*, 342 F.3d at 649; *Barajas,* 258 F3d at 1012.

In order to collect under the "alternative remedy" provision, at least one or more the settled overlapping allegations/claims in his *qui tam* Complaint must be "valid."  See *Bledsoe* 342 F.3d at 650-51 (. . .  it is true that a threshold requirement for a relator's ability to share in the proceeds of a FCA lawsuit is to file a valid *qui tam* action . ."); *United States ex rel. Bledsoe v. Community Health Sys.*, 501 F.3d 493, 522-23 (6th Cir. 2007)("Absent a valid complaint which affords a relator the possibility of ultimately recovering damages, there is no compelling reason for allowing a relator to recover for information provided to the Government").

16

In order to determine if a relator's complaint is "valid", it must be examined under the Public Disclosure Bar.

### C.      The Public Disclosure Bar

31 U.S.C. § 3730(e)(4) provides:

(A)  No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

(B) For purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information." 31 U.S.C. § 3730(e)(4)(pre-2010 amendment).[9]

A court reaches the original source question only if it finds the plaintiff's suit is "based upon the public disclosure of allegations or transactions" and that the public disclosure occurs in one of the precise sources enumerated in Section 3730(e)(4)(A). See *United States ex rel. Doe v. John Doe Corp.*, 960 F.2d 318, 324 (2nd Cir. 1992)( "if the public disclosure does not occur in 'a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media', 31 U.S.C. 3730(e)(4)(A), the qui tam action is not barred.)

Moreover, a court must analyze each allegation/claim separately in connection with the public disclosure bar analysis.  Even if one allegation/claim in a *qui tam* complaint is barred by the public disclosure bar, other claims or allegations in the *qui tam* complaint that were not

---

[9] The FCA's public-disclosure bar was amended effective July 22, 2010. Pub. L. No. 111-148, 124 Stat. 119, 901. The amendments do not apply to allegations of conduct before that date.  See *Hughes Aircraft Co. vs. United States ex rel Schumer*, 520 U.S. 939, 946 (1997)(conduct should be "assessed under the law that existed when the conduct took place").

publicly disclosed are not barred even if such claims are related to those that are.  See *Kirk v. Schindler Elevator Corp.*, Summary Order (2nd Cir. 2011)("Kirk Summary Order")(Relator's "failure-to-file claims" held barred by the public disclosure bar but Relator's "false reports claims" not barred).[10]   See also *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 467–68 (2007)("[t]he plaintiff's decision to join all of his or her claims in a single lawsuit should not rescue claims that would have been doomed by section (e)(4) if they had been asserted in a separate action. <u>And likewise, this joinder should not result in the dismissal of claims that would have otherwise survived</u>" (emphasis added) citing *United States ex rel. Merena* v. *SmithKline Beecham Corp.,* 205 F. 3d 97, 102 (CA3 2000)).

Thus, the Complaint is valid and Mr.  Amico is entitled to his statutory share of the Settlement if either he is the "original source" of the information on which the allegations in the Complaint are based or one or more of the allegations/claims in the Complaint that overlap with the Settlement were not publicly disclosed in the first place.

### D.      Original Source

An "original source" is "an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information." 31 U.S.C. § 3730(e)(4)(B). See *United States ex rel. Kreindler & Kreindler v. United Tech. Corp.*, 985 F.2d 1148, 1159 (2nd Cir. 1993).[11]

---

[10] A true and accurate copy of the Summary Order from Kirk is annexed to the Mayers Decl. as **Exhibit G**.

[11]  In *Kreindle*r, the Second Circuit added a third requirement (not found in the text itself) that a qui tam plaintiff must satisfy in order to be considered an "original source," namely, "a plaintiff also must have directly or indirectly been a source to the entity that publicly disclosed the allegations on which a suit is based."  This third element was overturned (or at the least seriously

A relator's knowledge is "direct" if it is "derived from the source without interruption or gained by the relator's own efforts rather than learned second-hand through the efforts of others." *U.S. ex rel. Laird v. Lockheed Martin Eng'g & Sci. Servs. Co.*, 336 F.3d 346, 355 (5th Cir. 2003) abrogated on other grounds by *Rockwell*, 549 U.S. at 457. "Direct" knowledge has been interpreted to mean knowledge that is "unmediated by anything but the plaintiff's own labor." *U.S. ex rel. Minn. Ass'n of Nurse Anesthetists v. Allina Health System Corp.*, 276 F.3d 1032, 1048–49 (8th Cir. 2002). "Direct" has been treated to mean "firsthand" knowledge or something that the relator "sees with his own eyes." *United States ex rel. Kinney v. Stoltz*, 327 F.3d 671, 674 (8th Cir. 2003) (he "sees it with his own eyes"); *United States ex rel. Grayson v. Advanced Mgmt. Tech., Inc.*, 221 F.3d 580, 583 (4th Cir. 2000)("A putative relator's knowledge is 'direct' if he acquired it through his own efforts, without an intervening agency"); *United States ex rel. Devlin v. California*, 84 F.3d 358, 362 (9th Cir. 1996) (direct means one cannot learn the information "secondhand"); *United States ex rel. Findley v. FPC-Boron Employees'*

---

called into question) by the Supreme Court's decision in *Rockwell*, which held that the phrase "information on which the allegations were based" in 31 U.S.C. § 3730(e)(4)(B) refers to the Relator's allegations and not the publicly disclosed allegations. *Rockwell* at 473.

In *United States ex ref. Hartpence v. Kinetic Concepts, Inc.,* No. 12-55396, 2015 WL 4080739, at *1 (9th Cir. July 7, 2015) (en banc), the Ninth Circuit explicitly overruled its decision in *Wang ex.rel.United States v. FMC Corp.,* 975 F.2d 1412 (9th Cir. 1992) which also created a judicially created requirement that relator needed to prove he or she "had a hand in the public disclosure of allegations" of fraud. The Ninth Circuit thought that the Supreme Court decision in *Rockwell* might have abrogated *Wang* but the Ninth Circuit decided not to reach that question because it decided to overrule *Wang* on other grounds. Specifically, reexamining the text of the FCA itself, *Hartpence* held that nothing in the text of the statute itself requires a relator to have a "hand in the public disclosure." *ld.* at *5.

Accordingly, "a relator must be an original source of its own allegations, not of the publicly disclosed allegations." *U.S. ex rel. Branch Consultants, LLC v. Allstate Ins. Co.*, 668 F. Supp. 2d 780, 797 (E.D. La. 2009)(citing *Rockwell)*. See also Kirk Summary Order at page 6 where the Second Circuit appears to have acknowledged that the third element from Kreindler was overruled by the Supreme Court ("The Supreme Court has clarified that the "information" referred to in the original source exception "is the information upon which the *relator['s]* allegations are based").

*Club*, 105 F.3d 675, 690 (D.C. Cir. 1997) ("In order to be 'direct,' the information must be first-hand knowledge.").

A relator's knowledge is "independent" if "it is not derived from the public disclosure." *U.S. ex rel. Branch Consultants, LLC v. Allstate Ins. Co.*, 668 F. Supp. 2d 780, 797 (E.D. La. 2009)(citing *United States ex rel. Reagan v. East Texas Medical Center Regional Healthcare System,* 384 F.3d 168, 177 (5th Cir.2004)); *U.S. ex rel. Minn. Ass'n of Nurse Anesthetists v. Allina Health Sys. Corp.*, 276 F.3d 1032, 1048 (8th Cir. 2002)(independent knowledge means knowledge "not derived from the public disclosure").

For instance, an attorney to a prior litigation who gained information from the defendant in that prior case who then brought a subsequent *qui tam* case against such defendant based on such previously disclosed public information lacks independent knowledge. *Kreindler,* 985 F.2d at 1159. In these types of situations, the relator's knowledge is dependent upon or gained from the publicly disclosed information. See *United States ex rel. Stinson, Lyons, Gerlin & Bustmante, v. Prudential Ins. Co*., 881 F.2d at 504-05 (relator who assisted claimants in prior litigation did not have "independent" knowledge of information ascertained via that activity, so not an "original source").

However, where the relator's information is not gained from the publicly disclosed information, but is obtained from a source "independent" of the public disclosure, then the relator has "independent" knowledge. See *U.S. ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Provident Life & Accident Ins. Co.* ("Provident"), 721 F. Supp. 1247, 1257-58 (S.D. Fla. 1989)(law firm/relator that derived primary information from independent investigation rather than discovery in prior civil litigation was "original source").

Courts must "look to the factual subtleties of the case . . . and attempt to strike a balance between those individuals who, with no details regarding its whereabouts, simply stumble upon a seemingly lucrative nugget and those actually involved in the process of unearthing important information about a false or fraudulent claim." *United States ex rel. Reagan v. E. Tex. Med. Ctr. Reg'l Healthcare Sys.*, 384 F.3d 168, 177 (5th Cir. 2004) (quoting *Laird*, 336 F.3d at 356).

 "While the paradigmatic "original source" is a whistleblowing insider, . . . [o]ther relators may also qualify if their information results from their own investigations."  *Prudential*, 944 F.2d at 1160; see also *Provident* 721 F. Supp. at 1257-58 (S.D. Fla. 1989).

As discussed and analyzed below, Mr. Amico "was clearly the source of the core information" on which the allegations in the Complaint are based.

## II.    ANALYSIS

### A.    The Settlement overlaps with the Complaint

The wrongful conduct set forth in the Settlement Agreement overlaps with the wrongful conduct alleged in the Complaint.   Among other things, the Complaint alleges that the Defendants' committed FCA violations with respect to the creation and sale of residential mortgage-backed securities ("RMBS") that are listed on Annex A of the Complaint.   See Complaint ¶ 1.  The Settlement Agreement releases any claims that the Government has against Defendants for "Covered Conduct". See Settlement Agreement ¶5.  "Covered Conduct" is defined as the creation, pooling, structuring, sponsorship, arranging, formation, packaging, marketing, underwriting, sale, or issuance prior to January 1, 2009 by the Deutsche Bank Parties of the RMBS identified in Annex 3, attached and hereby incorporated."   See Settlement Agreement ¶ 3.  The RMBS trusts identified in Annex 3 by the Government are the same or

substantially the same as those listed or deemed listed on Annex A of the Complaint.   The

Settlement Agreement expressly releases Defendants "from any civil claim the United States has

against the Released Entities for the Covered Conduct arising under . . . the False Claims Act, 31

U.S.C. §§ 3729, *et seq."*.   See Settlement Agreement ¶ 5.


**B.      One or more allegations/claims in the Complaint are not barred by the
         Public Disclosure Bar**

The Complaint contains one or more claims/allegations which have not been publicly

disclosed for purposes of the public disclosure bar.   These claims/allegations include, but are not

limited to Defendants: (1) concealing borrowers names and collateral property addresses to effect

their fraud; (2) use of CDOs to expand the scope of their fraud, by repackaging and selling

flawed RMBS; (3) use of credit default swaps (e.g., to AIG) to expand the scope of their fraud,

by transferring the risk of flawed RMBS and CDOs (containing flawed RMBS); (4) squeezing

debtors (e.g. AIG) under securities lending programs to obtain more collateral against flawed

RMBS that Defendants sold to investors; (5) selling defective mortgages directly to Fannie Mae

and Freddie Mac; (6) making material misstatements and omissions with respect to specific

individual mortgages (both with respect to individual borrowers and collateral properties); (7)

failing to disclose material facts such as the inclusion of multiple loans from the same borrower

in a single Deutsche Bank RMBS transaction or a concentration of loans in a single Deutsche

Bank RMBS secured by units in a single condominium complex.

**C.      Mr. Amico is the "Original Source" of the Information**

Mr. Amico is an "original source" because he "has 'direct' and 'independent' knowledge

of the information on which the allegations [in the Complaint] are based" and he "voluntarily

provided the information to the Government before filing" the Complaint "which [was] based on the information."  FCA Section 3730(e)(4)(B).

### 1.  Mr. Amico's knowledge of the information is "direct"

It cannot be disputed that the information that Mr. Amico generated on the borrowers and collateral properties backing the Deutsche Bank RMB was obtained by his own efforts rather than through the efforts of others (i.e., Mr. Amico's knowledge was "direct").  Mr. Amico was able to identify the borrower names and collateral property addresses using a proprietary, customized method he invented – he devised the methodology through his own efforts – he did not learn it from someone else.

After he unmasked the borrower name and collateral property address relating to a mortgage loan included in a DB RMBS trust, Mr. Amico unearthed mortgages and other documents on such borrower and the related collateral property.  From these documents, he created detailed "borrower histories" and "property histories".  Mr. Amico integrated the borrower history and related property history into a third distinct product which he calls a "borrower/property history".  Then, Mr. Amico created the Exhibits to the Complaint by synthesizing such information into a compresensible, easy to read narrative designed to meet the legal requirements to show the fraud by the Defendants.  Lastly, he supplemented the Exhibits as warranted by the facts he uncovered.   The borrower histories, property histories, borrower/property histories and Exhibits are all Mr. Amico's private work-product.

From the information he created on the borrowers and collateral properties, Mr. Amico could see the Defendants' fraud first hand -- the information demontrated the over-indebtedness of specific borrowers and the over-valuation of specific collateral properties.  Because he could see the fraud from the information he created, Mr. Amico could summarize the information into

the Exhibits.

Because he had direct knowledge of the fraud, he was able to make specific, non-generalized allegations of fraudulent representations and omissions against the Defendants – allegations that were not contained in any public disclosure.   In any case, Mr. Amico's knowledge of the information was "direct" because it was "derived from the source without interruption" and was "gained by the relator's own efforts rather than learned second-hand through the efforts of others." (quote from  *U.S. ex rel. Laird v. Lockheed Martin Eng'g & Sci. Servs. Co.*, 336 F.3d 346, 355 (5th Cir. 2003).   Mr. Amico's allegations in the Complaint were based on his "firsthand" knowledge of the information that he created and on his direct contact with Defendants (when Defendants refused to give him the loan schedules with the names of the borrowers and addresses of the collateral properties).  The information on which the allegations in the Complaint are based was created by Mr. Amico's own efforts and obtained without any intervening agency – he did not obtain the information from any other person or entity.

### 2.  Mr. Amico's knowledge of the information was "independent"

Mr. Amico's knowledge of the information on which the allegations in the Complaint are based was "independent" because he did not obtain his information through public disclosures.[12] Mr. Amico's knowledge came from the information that he unearthed himself and was not derived from any public disclosure.

---

[12] Mr. Amico first learned of the Defendants' low underwriting standards and other problematic RMBS securitization practices beginning in 2001 and 2002 when he was an investment banker at Citigroup.  He did an independent investigation of the RMBS business, including into Deutsche Bank's RMBS.  Through such work, Mr. Amico learned of the shoddy underwriting standards of Deutsche Bank, the failure to provide investors with the name of the borrower and address of the collateral properties, the failure to transfer mortgage loans to its RMBS trusts, and the use of MERS to hide from investors what entity owned a mortgage (since mortgage transfers occurred "off the radar" of the county clerks.)

Mr. Amico was able identify the borrower names and collateral property addresses correlating to the loans included in a specific Deutsche Bank RMBS through a method that Mr. Amico invented.  The methodology that Mr. Amico used in identifying the borrower names and collateral properties was not (and is not) publically available.

However, the ability to learn a borrower's name and the property address does not, by itself, reveal any useful information to demonstrate Defendants' fraud.  I.e., a single mortgage document Mr. Amico was able to unearth using his proprietary methodology did not provide information on the creditworthiness (or lack thereof) of the borrower or the value of the collateral property.  Using the borrower's name, he generated a unique "borrower history" and using the property address, he generated a unique "property history" each of which is Mr. Amico's unique work product and not a public document -- he did not gain his information of the properties and borrowers from any public disclosures.  Next, Mr. Amico combined the property history with the borrower history into a third distinct product – the "borrower/property history", also Mr. Amico's unique work product and not obtained by Mr. Amico from any public disclosure.  The borrower/property history was created by Mr. Amico to show the fraud by the Defendants with respect to single mortgage loans included in the Defendants' RMBS.  Lastly, Mr. Amico created Exhibits to the Complaint by synthesizing information from the borrower/property history into an easy to read narrative.  The Exhibits, along with the borrower/property histories, comprised the information on which the allegations in the Complaint were based.

Mr. Amico did not obtain or derive the Exhibits to the Complaint or the borrower/property histories from or through public disclosures – he generated this information himself.  Mr. Amico did more than merely conduct some "collateral research and investigations"

regarding the Deutsche Bank RMB, rather Mr. Amico "was clearly the source of the core information" in which the allegations in the Complaint are based.  *Kreindler*, 985 F.2d at 1159 (finding that relator acquired his knowledge from publicly disclosed information obtained during discovery in prior litigation formed the core information for relator's complaint).[13]

The Government might argue that Mr. Amico's knowledge is not direct or independent because it is based on information that could have been obtained by any member of the public. However, the Government will not, because it cannot, tell this Court how any member of the public can find the borrower and property level information that Mr. Amico generated because such information is simply not publicly available.[14]

The Government will undoubtedly argue that denying Mr. Amico a recovery is consistent with the purposes of the public disclosure bar and the original source provisions of the FCA. However, the Governments' own behavior demonstrates that the Government believed that the

---

[13]   The *Kreindler/Prudential/Houck* line of cases (each finding that relator didn't have "independent" knowledge because the knowledge was gained by the respective relator from publicly disclosed information obtained during discovery) is inapplicable to the facts of this case. As explained to Mr. Yu, Mr. Amico did not obtain his information from prior RMBS litigation (or from or through any other public disclosure for that matter) – rather it was Mr. Amico who provided information to plaintiffs and their lawyers who were suing various investment banks about the marketing and sale of RMBS.   Mr. Amico explained to Mr. Yu the information flow was a "one way street" from Mr. Amico to others.  Amico Dec. ¶ 18.

[14]   As Mr. Amico explains in his affidavit, searching for mortgage loans using the borrower's name or property address was impossible since the name and address was concealed by the Defendants.   Searching for the mortgage loans using other criteria was useless.   Searching indexes for mortgages recorded in the names of RMBS trusts produced no matching results -- of the more than 300,000 mortgages that Mr. Amico located which were (allegedly because they were never assigned) owned by RMBS trusts, not a single mortgage was recorded in the name of an RMBS trust.   Searching indexes for mortgages recorded in the name of an originator often produced no matching results, as many mortgages were recorded in the name of MERS (mortgage electronic registration systems).   Even if one could find mortgages in the name of an originator, one could not determine if such mortgage was collateral for any RMBS trust.   And searching for mortgage loans recorded in the name of MERS produced so many results as to be effectively useless.   Amico Dec. ¶ 28.

information that Mr. Amico was genuinely valuable.  When Mr. Amico sent Mr. Armand a sample of the information he could produce, it was Mr. Armand who set up a meeting with Mr. Amico.  At the meeting, Mr. Armand stated that he had never seen information like Mr. Amico's and that the information was extremely valuable.  It was Mr. Armand who asked Mr. Amico to act as a whistleblower against ten (10) foreign and domestic investment banks.  Amico Dec. ¶ 11-12.

If Mr. Amico's information was not valuable or the Government believed that Mr. Amico filing a *qui tam* action against Deutsche Bank was "parasitic", the DOJ would not have *asked him* to be a whistleblower in the first place and provide the DOJ with the information on the borrowers and properties that Mr. Amico generated with his proprietary methods.

Mr. Amico is not simply an "individual[] who, with no details regarding its whereabouts, simply stumble[d] upon a seemingly lucrative nugget" but was "actually involved in the process of unearthing important information about a false or fraudulent claim."  *Reagan* 384 F.3d 168 at 177.   When this Court "look[s] to the factual subtleties of the case", it will conclude that Mr. Amico has "direct and independent" knowledge of the information on which the allegations in the Complaint were based.  Mr. Amico's efforts and actions are precisely what Congress intended to encourage by the FCA and its relator recovery provisions.

**3.  Relator voluntarily provided the information to the Government before filing the Complaint**.

The Exhibits to the Complaint, along with all of the information and documents from the borrower/property histories, constituted the core information on which the allegations in the Complaint were based.  Mr. Amico provided all such information to the Government with his Declaration Supplement prior to filing the Complaint.

### III.    FRCP RULE 59 OR 60 IS THE PROPER BASIS FOR SEEKING RELIEF UNDER FCA § 3730(c)(5)

Federal Rules of Civil Procedure Rule 60 is a proper basis for a Relator seeking relief under § 3730(c)(5).  See U.S. ex rel. *Smart v. Christus Health*, No. 2:05-cv-287, 2013 WL 2289883 (S.D. Tex. May 22, 2013), aff'd sub nom. *U.S. ex rel Smart v. Health*, 563 F. App'x 314 (5th Cir. 2014).   In *United States ex rel. LaCorte v. Wagner*, 185 F.3d 188, 191 (4th Cir. 1999), the court held that Rule 60 was a proper basis for a Relator seeking relief under § 3730(c)(5):

> Indeed, an original qui tam plaintiff need not intervene in another qui tam action to vindicate his rights when the Government pursues an alternate remedy. Other mechanisms are available for qui tam plaintiffs to protect their interests. For example, before a settlement takes effect, a relator has an opportunity to contest the fairness, adequacy, and reasonableness of the settlement at a hearing. 31 U.S.C. § 3730(c)(2)(B). If the relator believes that the Government acted improperly in procuring a settlement, then he may return to the court which had jurisdiction over the settlement and move to reopen the judgment under FED. R. CIV. P. 60(b)(6).

## <u>PRAYER FOR RELIEF</u>

For the forgoing reasons, Mr. Amico respectfully requests that the Court grant this motion in his favor as follows:

a.     award Mr. Amico his statutory share of at least 15 percent but not more than 30 percent of the proceeds recovered from the Defendants by the Government under the Settlement Agreement, and

b.     grant Relator all other relief that the Court deems just and proper.

## <u>DEMAND FOR TRIAL BY JURY</u>

Mr.  Amico respectfully demands a trial by jury for all issues so triable as a matter of right.

RESPECTFULLY SUBMITTED this 14th day of February, 2017.


By:  /s/ Matthew Mayers_____
Matthew Mayers
Law Office of Matthew Mayers
7 Whippoorwill Lane
Armonk, NY 10504
Phone: (917) 923-6386
E-Mail:  matt@mmayersesq.com

*Attorney for Relator Joseph Amico*