USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 5/8/17

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____x

UNITED STATES OF AMERICA, ex rel.
JOSEPH AMICO,

               Plaintiff / Relator

     -against-

DEUTSCHE BANK AG; DB STRUCTURED
PRODUCTS, INC.; DEUTSCHE BANK
SECURITIES INC.; DB HOME LENDING LLC;
DB HOME LENDING HOLDINGS LLC;
MORTGAGEIT, INC.; DEUTSCHE ALT-A
SECURITIES, INC.; ALTAMONT HOLDINGS
CORP.; MORTAGEIT SECURITIES CORP.;
ACE SECURITIES CORP.; DEUTSCHE BANK
NATIONAL TRUST CO.;

               Defendants.

No. 15 Civ. 9551 (CM)

_____x

## DECISION AND ORDER DENYING PLAINTIFF / RELATOR'S MOTION TO BE AWARDED A STATUTORY SHARE OF THE PROCEEDS OF THE GOVERNMENT'S SETTLEMENT WITH DEFENDANTS

On December 7, 2015, Plaintiff-Relator Joseph Amico ("Amico") filed this action on behalf of the United States pursuant to the *qui tam* provisions of the False Claims Act ("FCA"), 31 U.S.C. §§ 3729–3733, against Deutsche Bank and the other above-captioned financial institutions (collectively, "Defendants"). On January 29, 2016, Amico and the Government entered into a stipulation agreement providing that all of Amico's *qui tam* claims against Defendants were dismissed without prejudice to Amico. In January 2017, the Government and Defendants entered into a settlement agreement based on the same wrongful conduct alleged in Amico's *qui tam* complaint.

1

Amico now moves under 31 U.S.C. § 3730(c)(5) to recover a share of the settlement proceeds. For the reasons set forth below, Amico's motion is DENIED.

## BACKGROUND[1]

The essence of the Complaint is that Defendants committed FCA violations by submitting false claims to the Government in connection with the creation, marketing, and sale of defective residential mortgage-backed securities ("RMBS") and collateralized debt obligations ("CDOs").

RMBS may be described as follows:

[A]n [R]MBS is created when a "depositor" buys an inventory of mortgages (or "loan pool") from a primary lender (or "originator"). After the depositor obtains the loan pools, it places them in issuing trusts, securitizes them by organizing the loans into "tranches," and issues securities backed by the loan pools. The depositor uses the borrowers' monthly payments as the revenue stream to pay investors who have bought the securities. Each tranche has a different risk profile and is assigned a credit rating . . . . Because the value of an [R]MBS depends on the ability of the borrowers to repay the principal and interest on the underlying loans as well as the adequacy of the collateral in the event of default, thorough assessments of the borrowers' creditworthiness and the homes' values are paramount.

*In re Bear Stearns Mortg. Pass-Through Certificates Litigation*, 851 F. Supp. 2d 746, 751–52 (S.D.N.Y. 2012). Defendants securitized RMBS and used them as collateral for CDOs. Like RMBS, the performance of the CDOs was ultimately tied to the performance of the underlying mortgage loans. (Compl. ¶ 79.)

Defendants allegedly participated in each stage of the process of creating, marketing, and selling RMBS. (*Id.* ¶¶ 68–78.) Defendants sold RMBS and CDOs to the United States. The RMBS were sold pursuant to registration statements that purportedly described the RMBS's

---

[1] The following facts are taken from Amico's *qui tam* complaint (Dkt. No. 7 ("Complaint" or "Compl.")) and the Government's Response in Opposition (Dkt. No. 19 ("Gov't Opp'n")).

terms (the "Registration Statements"), and the CDOs were sold pursuant to offering circulars, pitch books, and other written materials (collectively, "Offering Documents"). (*id.* ¶ 63.)

The Complaint alleges that the Registration Statements and Offering Documents deliberately concealed the identities of borrowers and the addresses of properties in order to prevent purchasers of RMBS and CDOs, including the United States, from conducting their own due diligence. (*See id.* ¶¶ 12, 82, 159–78.) As a result, the United States was unable to uncover the falsity of Defendants' claims that the mortgage loans underlying the RMBS and CDOs were sound and in compliance with the underwriting standards set forth in the Registration Statements and Offering Documents. (*See id.* ¶¶ 12–37.)

Amico, who is an attorney, alleges that he uncovered Defendants' fraud by conducting a loan-level review of certain mortgage notes underlying the RMBS and CDOs created and sold by Defendants. He took a random sample of hundreds of loans from multiple RMBS trusts and created a "borrower/property history" for them. His investigation allegedly revealed that: 1) valid assignments of mortgage notes were never timely delivered to the RMBS trusts, which helped prevent buyers of RMBS from conducting their own due diligence (*id.* ¶¶ 31–32); 2) many of the borrowers bore characteristics indicating they were likely to default on their mortgages (*id.* ¶¶ 27–29); and 3) many of the properties were appraised at artificially high values (*id.*). Amico asserts that each of these findings contradicts the warranties made in the Registration Statements and Offering Documents, or otherwise constitutes material information that Defendants failed to disclose.

Amico filed the Complaint on December 7, 2015 – more than seven years after the 2008 financial crisis erupted. In that seven-year period, countless public disclosures were made detailing the RMBS fraud committed by major financial institutions, including Deutsche Bank,

and the legal actions the Government and private parties took in response. Amico's action is therefore unlike the typical *qui tam* case, where a relator's insider knowledge is needed to help uncover the defendant's fraud. The entire world – including specifically the Government – knew about Defendants' RMBS chicanery *years* before Amico filed his lawsuit. At least one federal agency, the Federal Housing Finance Agency ("FHFA"), sued Deutsche Bank over three years before Amico filed the Complaint, and for basically the same thing. *See FHFA v. Deutsche Bank AG*, No. 11 Civ. 6192 (S.D.N.Y. Jun. 13, 2012). That case settled nearly two years before Amico filed the Complaint. *See* Matthew Goldstein, *Deutsche Bank to Pay $1.9 Billion Over Troubled Mortgage Securities*, N.Y. TIMES, (Dec. 20, 2013).

Before the FHFA case, a group of private RMBS investors sued Deutsche Bank in this Court for securitizing extremely high-risk loans into RMBS, despite knowledge of the loans' poor quality, and then falsely claiming that the loans satisfied applicable underwriting standards. *See Dexia SA/NV et al. v. Deutsche Bank AG, et al.*, 11 Civ. 5672 (S.D.N.Y.). A number of similar lawsuits were brought against Defendants in other forums. *See, e.g., Fed. Home Loan Bank of Boston v. Ally Fin., Inc., et al.*, No. 11 Civ. 10952 (D. Mass.); *Mass. Mut. Life Ins. Co. v. DB Structured Products Inc.*, No. 11 Civ. 300939 (D. Mass.); *Cambridge Place Inv. Mgmt., Inc. v. Morgan Stanley, et al.*, No. 10 Civ. 11376 (D. Mass.); *West Virginia Inv. Mgmt. Bd. v. Residential Accredited Loans, Inc., et al.*, No. 10 Civ. 00461 (S.D. W.Va.); *Main State Ret. Sys. v. Countrywide Fin. Corp., et al.*, No. 10 Civ. 00302 (C.D. Cal.).

Besides being the subject of multiple lawsuits, Deutsche Bank's RMBS-related practices were investigated by the U.S. Senate's Permanent Subcommittee on Investigations (the "Senate PSI") and the Financial Crisis Inquiry Commission ("FCIC"). In April 2011, the Senate PSI published a report, *Wall Street and the Financial Crisis: Anatomy of a Financial Collapse*,

4

detailing the origins of the 2008 financial crisis (the "PSI Rep.").[2] An entire section of the report, "Running the CDO Machine: Case Study of Deutsche Bank," details how Deutsche Bank created, marketed, and sold RMBS and CDOs (*see* PSI Rep. at 330–75), and concludes that Deutsche Bank "failed to inform potential investors" of negative information about its CDOs. (*id.* at 375). The FCIC report, released in January 2011, publicizes the oral testimony and interviews of Deutsche Bank employees as to the bank's RMBS-related due diligence practices.[3]

These and other lawsuits and investigations were not obscure events. News organizations, both big and small, covered them extensively. *See, e.g.*, Kara Scannell, Tom Braithwaite, & Camilla Hall, *US Task Force Probes Nine Banks on Mortgage-Backed Securities*, FINANCIAL TIMES (Oct. 23, 2013); Daniel Wilson, *Goldman, Deutsche Bank Can't Escape FHFA RMBS Fraud Suits*, LAW 360 (Nov. 13, 2012); Nelson D. Schwartz, *Federal Regulators Sue Big Banks Over Mortgages*, N.Y. TIMES (Sep. 2, 2011); Alison Frankel, *Dexia Sues Deutsche Bank Over $1 Billion MBS Investment*, REUTERS (Jul. 4, 2011); Jack Bernstein & Jesse Eisinger, *U.S. Senate Investigation Gives New Details on Magnetar*, PROPUBLICA (Apr. 14, 2011); Gretchen Morgenson & Louise Story, *Naming Culprits in the Financial Crisis*, N.Y. TIMES (Apr. 13, 2011); Tom Hals, *Fund Sues Banks for $1.2 Billion Loss Tied to Subprime*, REUTERS (Jul. 12, 2010); Kevin Walker, *Misfits, Fools Watched as U.S. Neared Precipice*, TAMPA JOURNAL (Apr. 11, 2010).

Deutsche Bank's skullduggery also received attention in at least one bestselling book and its major motion picture adaptation. *See* MICHAEL LEWIS, THE BIG SHORT (2010); THE BIG SHORT (Paramount Pictures 2015).

---

[2] Available at http://www.gpo.gov/fdsys/pkg/CHRG-112shrg57323/pdf/CHRG-112shrg57323.pdf.

[3] Available at http://fcic.law.stanford.edu/resource/interviews.

This is not Amico's first *qui tam* action. He filed virtually identical lawsuits against other major banks that were identified long ago as progenitors of the 2008 financial crisis: one against Citigroup; one against Wells Fargo; and one against a consortium comprising Credit Suisse, GE Financial, the Royal Bank of Scotland, and UBS. (Gov't Opp'n at 1–2.)

In the Citigroup case, Amico alleged that he conducted a loan-level review of certain mortgage loans underlying Citigroup's RMBS and CDOs to uncover that Citigroup either knowingly or recklessly misrepresented the ability of underlying borrowers to repay their loans, and the value of underlying properties. (Gov't Opp'n, Ex. B. ("Citigroup Op.") at 4.) When the lawsuit was filed this was old news; Citigroup had already been sued at least three times for the same alleged misconduct. *See Federal Housing Finance Agency v. Citigroup Inc.*, No. 11 Civ. 6196 (S.D.N.Y. Sept. 2, 2011); *S.E.C. v. Citigroup Global Markets Inc.*, No. 11 Civ. 7387 (S.D.N.Y. Oct. 19, 2011); *U.S. ex rel. Szymoniak v. Am. Home Mortg. Servicing Inc.*, No. 10 Civ. 1465 (D.S.C. Feb. 3, 2014). Thus, my colleague Judge Seibel dismissed Amico's *qui tam* complaint. (*See* Citigroup Op. at 22.) She reasoned in pertinent part that the FCA's "public disclosure" bar – which provides that a *qui tam* suit does not lie when information about the fraud was disclosed to the public prior to its filing (*see U.S. ex rel. Jamison v. McKesson Corp.*, 649 F.3d 322, 332 (5th Cir. 2011)) – rendered Amico's case meritless, because his claim to be the source of the Government's information about the alleged fraud was specious.

When Amico filed the Complaint, the Government immediately threatened to move to dismiss it – that is, the Government threatened to make the same motion that Judge Seibel granted in the parallel case against Citibank. Amico, hoping to avoid a merits-based dismissal, asked the Government simply to decline to intervene and allow him to maintain the action on his own. The Government did not fall for that ruse, so Amico voluntarily dismissed his case without

prejudice, pursuant to Fed. R. Civ. P. 41(a). Of course, no *qui tam* case may be dismissed without the Government's consent. 31 U.S.C. § 3730(b)(1); *U.S. ex rel. Summit v. Michael Baker Corp.*, 40 F. Supp. 2d 772, 775 (E.D. Va. 1999). Accordingly, the Government gave its consent to Amico's withdrawal of the Complaint by entering into a stipulation to that effect with Amico.

Amico unquestionably elected to dismiss his action to avoid adjudication that the action lacked merit under the public disclosure bar. He undoubtedly hoped that dismissal "without prejudice" would somehow preserve his right to argue that he was entitled to his reward in the all-but-inevitable event that the Government entered into a settlement agreement with Defendants.

The Government did enter into a settlement agreement with Defendants, based on the same wrongful conduct alleged in Amico's Complaint. In January 2017, Defendants agreed to pay $3.1 billion to the U.S. Treasury, as well as "in kind" consumer relief of $4.1 billion. (*See* Mayers Decl. Ex. 7.)

This motion followed.

## DISCUSSION

### I.    The FCA's *Qui Tam* Provisions and the Public Disclosure Bar

"The FCA imposes liability on any person who 'knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval' to the U.S. government; or who 'knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.'" *U.S. ex rel. Polansky v. Pfizer, Inc.*, 822 F.3d 613, 618 (2d Cir. 2016) (quoting 31 U.S.C. § 3729(a)–(b)). Since its enactment, "the FCA has encouraged private citizens to report fraud by promising a percentage of any eventual recovery." *Bishop v. Wells Fargo & Co.*, 823 F.3d 35, 44 (2d Cir. 2016). "Thus, the FCA permits a private person, known as

7

a 'relator,' to bring a *qui tam* action in his own name and in the name of the United States for a violation of the FCA." *U.S. v. L-3 Comms. Eotech, Inc.*, No. 15 Civ. 9262, 2017 WL 464431 (S.D.N.Y. Feb. 3, 2017) (citing 31 U.S.C. § 3730(b)(1)).

The relator is required to serve the Government with a copy of his *qui tam* complaint and a "written disclosure of substantially all material evidence and information [he] possesses." 31 U.S.C. § 3730(b)(2). Once the relator has done so, the Government has 60 days to choose between: 1) intervening and proceeding with the *qui tam* action itself; or 2) declining to intervene and letting the relator pursue the action to resolution. *Id.* § 3730(b)(4). If the *qui tam* action is successful, the relator is entitled to share in the recovered funds. If the Government intervened, the relator is entitled to receive 15–25% of the proceeds. If the Government declined to intervene, the relator may collect 25–30%. *Id.* § 3730(d)(1)–(2).

Besides the intervene-or-abstain options, the FCA provides that: "Notwithstanding 31 U.S.C. § 3730(b), the Government may elect to pursue its claims through any *alternate remedy* available to the Government, including any administrative proceeding to determine a civil money penalty." *Id.* § 3730(c)(5) (emphasis added). "If any such alternate remedy is pursued in another proceeding, [the relator] shall have the same rights in such proceedings as [he] would have had if the action had continued under this section." *Id.*

There is, however, a limit on a private person's ability to participate in the *qui tam* process. From the beginning, the FCA has barred the maintenance of a *qui tam* action in circumstances where the fraud alleged was publicly disclosed before the commencement of the action. The public disclosure bar has evolved over time. The version that was in effect on the date of the fraudulent conduct alleged in the Complaint provided that no court "shall have jurisdiction over" any *qui tam* action that is "based upon the public disclosure of allegations or

8

transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless . . . the person bringing the action is an original source of the information." 31 U.S.C. § 3730(e)(4)(A) (1988). To qualify as an "original source," a relator must have "direct and independent knowledge of the information on which the allegations are based," and must have "voluntarily provided the information to the Government before filing an action under this section that is based on that information." *Id.* § 3730(e)(4)(B).[4]

The public disclosure bar in § 3730(e)(4) " . . . is intended to bar 'parasitic lawsuits' based upon publicly disclosed information in which would-be relators 'seek remuneration although they contributed nothing to the exposure of the fraud.'" *U.S. ex rel. Kreindler & Kreindler v. United Techs. Corp.*, 985 F.2d 1148, 1159 (2d Cir. 1993) (quoting *U.S. ex rel. John Doe v. John Doe Corp.*, 960 F.2d 318, 319 (2d Cir. 1992)). It therefore precludes *qui tam* plaintiffs from filing complaints "based on information that would have been equally available to strangers to the fraud transaction had they chosen to look for it as it was to the relator." *Id.* at 1158.

## II.   Amico's Complaint Violates the Public Disclosure Bar

There can be no doubt that Amico's Complaint violates the public disclosure bar. The proposition that the Government knew about Defendants' behavior underlying the allegations of the Complaint is so indisputably true as to require little comment. That the Government, in the person of the FHFA, had already sued these very Defendants for their RMBS-related misconduct

---

[4] In March 2010, the Patient Protection and Affordable Care Act ("ACA") amended 31 U.S.C. § 3730(e)(4), the FCA's public disclosure provision. Since the amendment does not mention retroactivity and effects a substantive change in the law, the conduct alleged in Amico's complaint must be "assessed under the law that existed when the conduct took place." *Hughes Aircraft Co. v. U.S. ex rel. Schumer*, 520 U.S. 939, 946 (1997). Since the false claims alleged in the Complaint – Defendants' false representations and material omissions in the Registration Statements and Offering Documents – occurred before March 2010, the pre-ACA version of the public disclosure bar applies. The parties do not dispute this.

is dispositive of the question in and of itself. Moreover, the Senate PSI and FCIC reports, as well as countless news articles published since 2008, detail the very essence of the Complaint. Most of this material is available to anyone with access to the Internet. In light of these *very public* disclosures, Amico did not assert a valid *qui tam* action. *See U.S. ex rel. Rosner v. WB/Stellar IP Owner, LLC*, 739 F. Supp. 2d 396, 404–08 (S.D.N.Y. 2010). This precludes him from recovering a relator's share of the Government's settlement with Defendants.

That Amico voluntarily dismissed his action without prejudice does not insulate him from a review of the Complaint to see whether its allegations were based upon publicly available information.

In a failed attempt to avoid the public disclosure bar, Amico argues that he is an original source of the allegations set forth in the Complaint. He clearly is not, for the following reasons.

First, Amico could not have had direct and independent knowledge of Defendants' RMBS fraud because he never worked for Deutsche Bank. *See U.S. ex rel. Newell v. City of St. Paul*, 728 F.3d 791, 797 (8th Cir. 2013). Amico's only professional experience in the finance industry is his having worked for Citigroup from 2000 to 2002, long before the fraud at issue was even committed. This experience did not qualify him as an original source in his lawsuit against Citigroup, so it definitely will not do so here. (*See* Citigroup Op. at 21–22.)

Second, even if Amico had worked for Deutsche Bank, he admits that the allegations underlying the Complaint are based on knowledge he derived from third-party sources, including public records. Knowledge is not direct and independent if it is "based on research into public records, review of publicly disclosed materials, or some combination" thereof. *U.S. ex rel. Ondis v. City of Woonsocket*, 587 F.3d 49, 59 (1st Cir. 2009); *see also Rosner*, 739 F. Supp. 2d at 408 (S.D.N.Y. 2010). This inherent vice is not cured by Amico's purported invention of the method

10

he used to uncover Defendants' fraud. *See Rosner*, 739 F. Supp. 2d at 403. As Judge Seibel noted in the Citigroup case, it is utterly irrelevant to the "original source" determination that Amico may have "had the diligence or skill to obtain further evidence of fraud." (Citigroup Op. at 22.)

In short, the Government had no need for Amico or his information. His *qui tam* action was archetypally parasitic, and, for this reason, necessarily meritless. Thus, Amico is unable to recover a relator's share under § 3730(c)(5).

## III.   The Government's Alternative Argument Need Not Be Reached

The Government makes the alternative argument that Amico's motion should be denied on procedural grounds, specifically, that Amico is barred from recovering his relator's share under § 3730(c)(5) because he voluntarily dismissed his action against Defendants. (Gov't Opp'n at 2–3.) In so arguing, the Government relies on *U.S. v. L-3 Comms. Eotech, Inc.*, No. 15 Civ. 9262, 2017 WL 464431 (S.D.N.Y. Feb. 3, 2017), a case in which this Court held that a relator precluded himself from recovering under § 3730(c)(5) because he voluntarily dismissed his *qui tam* action. There, my colleague Judge Sullivan reasoned that an existing *qui tam* action is a prerequisite for recovering settlement proceeds under § 3730(c)(5).

There is no need to reach this argument. While reasonable people could disagree about the "plain meaning" of § 3730(c)(5), it is certain that Congress never intended to allow Amico and opportunists of his ilk to rob the treasury by bringing meritless *qui tam* actions. *See Ping Chen ex rel. U.S. v. EMSL Analytical, Inc.*, 966 F. Supp. 2d 282, 295 (S.D.N.Y. 2013). The FCA's public disclosure bar prevents Amico from recovering a relator's share, and that is reason enough to dismiss the instant motion.

Accordingly, there is no need for the Court to resolve the issue of whether recovery under § 3730(c)(5) requires an existing *qui tam* action.

11

## CONCLUSION

For the foregoing reasons, Amico's motion is DENIED.

The Clerk is instructed to remove the motion at Docket No. 11 from the Court's list of pending motions.

Dated: May 8, 2017

_____
U.S.D.J.

BY ECF TO ALL COUNSEL